FILED
August 11, 2026
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § § § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT A**

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

d

MM

M

d

---

M M M

M

M M

1. Plaintiff Josue Zavala is an individual residing in Tarrant County, Texas.
2. Plaintiff was employed by Defendant AT&T from approximately April 18, 2014, until November 1, 2024, as a Premises Technician.
3. Defendant AT&T Services, Inc. is a corporation doing business in Texas and may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

4. At all relevant times, AT&T employed Plaintiff and was a party to the Collective Bargaining Agreement governing Plaintiff's employment.
5. Defendant Communications Workers of America, Local 6201 is a labor organization representing bargaining unit employees employed by AT&T.
6. At all relevant times, CWA Local 6201 served as Plaintiff's exclusive bargaining representative and owed Plaintiff a duty of fair representation under federal labor law.
7. During the events giving rise to this action, Plaintiff served as the Chief Union Steward for his reporting garage, representing approximately fifty bargaining-unit employees in grievance and contractual matters.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.
9. Jurisdiction is further conferred by 42 U.S.C. § 12117(a) and 29 U.S.C. § 185.

10. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in Tarrant County, Texas.

11. This action arises from Plaintiff's termination by Defendant AT&T Services, Inc. ("AT&T") following Plaintiff's repeated requests that AT&T administer employee work schedules in accordance with the parties' Collective Bargaining Agreement ("CBA") and following Plaintiff's requests for reasonable accommodation under the Americans with Disabilities Act ("ADA").

12. Plaintiff brings claims against Defendant AT&T under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., for disability discrimination, failure to accommodate, and retaliation.
13. Plaintiff also brings a hybrid claim under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, against AT&T for breach of the Collective Bargaining Agreement and against Defendant Communications Workers of America, Local 6201 ("CWA" or "the Union") for breach of its duty of fair representation.
14. Plaintiff alleges that AT&T required Premises Technicians to work under an unwritten "Release Page" scheduling practice that operated outside the scheduling procedures contained in Appendix J of the Collective Bargaining Agreement. Plaintiff repeatedly objected to that practice, requested that any additional work be scheduled or assigned pursuant to the CBA, and later requested predictable scheduling as a reasonable accommodation for his disability. Rather than address those concerns, AT&T disciplined and ultimately terminated Plaintiff.
15. Plaintiff further alleges that the Union failed to fairly represent him by refusing to advance his grievance to arbitration despite being presented with the relevant contractual provisions, Company policies, and documentary evidence supporting Plaintiff's position.
16. Plaintiff seeks all relief available under the ADA and LMRA, including reinstatement or front pay, back pay, compensatory damages, punitive damages where authorized by law, declaratory relief, costs, attorney's fees if later retained, and all other relief to which he may be entitled.

M M

M

17. Plaintiff timely filed Charge No. 450-2025-04773 with the Equal Employment Opportunity Commission alleging disability discrimination and retaliation.
18. On or about August 25, 2025, the EEOC issued Plaintiff a Notice of Right to Sue.
19. Plaintiff timely commenced this action within ninety days after receiving the Notice.

M M M

20. Plaintiff pursued every contractual and internal union remedy reasonably available before seeking judicial relief.
21. Plaintiff timely filed Grievance No. D-022-24-ATTSW challenging his termination. AT&T denied the grievance at the General Level on August 21, 2025.
22. On September 11, 2025, CWA Staff Representative José Lozano notified Plaintiff that he would not recommend Plaintiff's grievance for arbitration.
23. Pursuant to the Union's internal appeals procedures, Plaintiff timely appealed that recommendation to the CWA District 6 Arbitration Review Panel. On January 2, 2026, the Arbitration Review Panel denied Plaintiff's appeal.
24. Plaintiff timely appealed the Panel's decision to CWA President Claude Cummings, Jr., who denied the appeal on March 16, 2026.
25. Plaintiff timely appealed the President's decision to the CWA Executive Board on March 18, 2026. Plaintiff mailed the appeal by certified mail, retained proof of mailing and delivery, and separately notified senior Union officials that the appeal had been received.
26. The CWA Internal Appeals Procedures require the Executive Board to review appeals and notify interested parties of its decision. Although the procedures do not establish a specific deadline for the Executive Board, each preceding level of review requires action within thirty days.
27. After filing his Executive Board appeal, Plaintiff repeatedly sought confirmation regarding its status. Plaintiff mailed additional certified correspondence requesting a decision and retained proof that those requests were delivered.
28. Plaintiff appealed the President's decision to the CWA Executive Board on March 18, 2026. Plaintiff has documentary proof that the appeal was mailed, delivered, and

received. After submitting his appeal, Plaintiff received no acknowledgment or status update from the Executive Board for several months.

29. During that period, Plaintiff sent follow-up correspondence by email and certified mail to CWA Secretary-Treasurer Ameenah Salaam requesting confirmation of the status of his appeal and whether any further internal action remained pending. Plaintiff did not receive a substantive response to those inquiries before the Executive Board issued its final decision.

30. On July 20, 2026, the CWA Executive Board issued a written decision denying Plaintiff's appeal of the termination grievance, upholding the decisions of President Claude Cummings and the District 6 Arbitration Review Panel, and advising Plaintiff that he "has now exhausted [his] Internal Appeals Procedures, and there is no further action to be taken." (See Exhibit 11.) The following day, on July 21, 2026, the Executive Board issued a separate written decision denying Plaintiff's appeal of his Decision Making Leave ("DML") grievance, similarly advising Plaintiff that he had exhausted his internal remedies and that no further action was available to him. (See Exhibit 21 and Section W, infra ¶¶ 219-247.)

31. Plaintiff alleges that he diligently pursued every level of review available under the CWA Internal Appeals Procedures before seeking judicial relief. Plaintiff filed the present action against the Union only after receiving the Executive Board's final decisions confirming that his internal remedies had been exhausted with respect to both grievances.

M M

32. Plaintiff was employed by AT&T as a Premises Technician for approximately ten years. During approximately the first seven years of his employment, Plaintiff worked in California under the jurisdiction of CWA Local 9509, where he successfully performed the same Premises Technician position while maintaining a positive work record. Plaintiff later transferred to Texas, where he continued performing the same job title but became subject to different management practices.

33. During Plaintiff's employment in California, Premises Technicians generally worked to their posted schedules. If Plaintiff completed his assigned work before the end of his

scheduled shift, he was permitted to return to the garage and conclude his workday, provided he arrived within the time required by local practice. If Plaintiff remained on an assignment beyond the scheduled end of his shift, it was because he was completing work that had already been assigned before the end of his scheduled hours. Plaintiff was not expected to continue accepting additional work after completing his scheduled assignments simply because management had not yet issued an "All Clear."

34. Plaintiff alleges that the practical difference between the California and Texas operations was not the existence of an "All Clear" communication, but the legal and operational effect it had on employees' scheduled workdays. During Plaintiff's employment in California, an All Clear issued before the end of the scheduled shift indicated that no additional dispatched work was expected and employees could leave early if they chose, while remaining entitled to work or be paid through the end of their scheduled shift. If the All Clear was issued after the scheduled end of the shift, Plaintiff alleges it imposed no obligation to continue working because the scheduled workday had already concluded. By contrast, in Texas, Plaintiff alleges that Premises Technicians were expected to continue searching for and requesting additional assignments after the end of their scheduled shifts until management later issued a Release Page, and failure to do so subjected employees to discipline.

35. Plaintiff later transferred to Texas and became represented by CWA Local 6201.

36. Although the written AT&T Field Services Technician Expectations remained materially the same following Plaintiff's transfer, Plaintiff alleges that the day-to-day administration of employee scheduling changed substantially.

37. Plaintiff alleges that Premises Technicians in Texas were not given affirmative direction or assignments to work beyond their posted schedules. Instead, after the scheduled shift ended, technicians were required to click a dispatch button to search for and retrieve additional work from the available pool. Management did not extend scheduled work hours, assign specific overtime, or otherwise direct technicians to perform particular work after the scheduled shift. Technicians were expected to continue searching until management issued a 'Release Page.'

M

38. Plaintiff's employment was governed by a Collective Bargaining Agreement between AT&T and the Communications Workers of America.
39. Appendix J of the Collective Bargaining Agreement governs Plaintiff's work schedules. Section 1 provides that "[t]he Company will determine and post the work schedules" and that "[w]ork schedules will be posted for a minimum period of one (1) week and are subject to change, with forty-eight (48) hours notice to the employee." Section 2 further provides: "If an employee is notified less than twelve (12) hours before the originally scheduled start time of a change in work hours, the affected employee will receive two (2) hours of pay at the straight time rate." Plaintiff alleges that these provisions demonstrate the parties anticipated that work schedules and work hours could change, but negotiated specific notice requirements and compensation when those procedures were not followed.
40. Plaintiff alleges that Defendant's Release Page practice complied with neither provision. Defendant did not provide forty-eight hours' notice of changes to posted work schedules under Section 1, nor did Defendant provide the notice or compensation required by Section 2 when requiring Plaintiff to work beyond his posted work hours. Instead, Defendant treated the posted end time of Plaintiff's workday as optional and required Plaintiff to continue working until management later communicated that technicians could stop accepting additional work.
41. Appendix J also provides that employees scheduled or assigned overtime will be compensated in accordance with applicable federal and state law and limits overtime assignments except under specified circumstances.
42. Plaintiff alleges that these provisions establish the contractual framework governing employee schedules, hour changes, overtime assignments, and related compensation.
43. During grievance proceedings and subsequent discovery, Defendant asserted that the Change of Hours provision applies only to changes in an employee's scheduled start time and does not apply to changes in an employee's scheduled end time. Plaintiff alleges that nothing in the language of the Change of Hours provision supports that distinction. The provision refers generally to changes in "work hours" and does not limit its application to

the beginning of a scheduled tour. Plaintiff further alleges that the provision derives from the Work Schedules section, which governs the work hours determined and posted by the Company, including both the scheduled start and scheduled end of the workday. Plaintiff therefore alleges that Defendant's interpretation improperly reads limitations into the contract that do not appear in the negotiated language.

44. Plaintiff further alleges that Defendant has offered differing explanations regarding the scope of the Change of Hours provision. At various times, Defendant has asserted that the provision applies only to changes in shift start times, while at other times Defendant has provided different explanations regarding its application. Plaintiff alleges that these differing interpretations are significant because none are reflected in the text of the Collective Bargaining Agreement. Plaintiff further alleges that Defendant's shifting explanations demonstrate the absence of a consistent contractual basis for excluding end-of-day schedule extensions from the Change of Hours provision.

M

r r r r r

45. Appendix J organizes the parties' negotiated rights and obligations into separate Supplemental Statements addressing different contractual subjects. Supplemental Statement 3 governs employees' work schedules, including the establishment of work schedules, changes in work hours, cancellation of hours, and split workdays. Supplemental Statement 2 separately governs employees' compensation, including rates of pay, overtime, shift differentials, and premium pay. Plaintiff alleges that the parties deliberately negotiated work schedules and compensation as separate contractual subjects, each with its own procedures and requirements.

46. Plaintiff alleges that, by posting the weekly work schedule in advance, Defendant determined the hours that would constitute Plaintiff's scheduled workweek. During any workweek in which Plaintiff had not yet exceeded forty (40) hours, any requirement to

work beyond those posted hours necessarily altered the work schedule previously determined by the Company. Plaintiff therefore alleges that such additional hours constituted changes in work hours governed by Appendix J's Work Schedules and Change of Hours provisions before any determination could be made regarding whether those hours would ultimately be compensated at straight-time or overtime rates under the Basis of Compensation provisions.

47. Plaintiff further alleges that Appendix J distinguishes between determining an employee's work schedule and determining how hours are compensated. The Company determined Plaintiff's work schedule one week in advance when it posted his scheduled tours. The overtime provision does not authorize the Company to disregard or retroactively alter those previously determined work schedules. Rather, it governs only the rate at which qualifying hours are paid after they have been worked. Plaintiff therefore alleges that Defendant could not skip the Work Schedule provisions simply because it later intended to pay those hours under the compensation provisions.

r d r

48. Defendant's Field Services Technician Expectations included a section entitled "Incidental Overtime," which stated: "Based on needs of the business it may be necessary to work incidental overtime to complete a current job and/or the rest of the load." Plaintiff alleges that this language was presented as one operational expectation among several contained within the Technician Expectations and was not incorporated into or intended to supersede the negotiated provisions of Appendix J governing work schedules or changes in work hours.

49. Plaintiff alleges that, by its own terms, the Incidental Overtime provision is limited. It refers to working incidental overtime 'to complete a current job and/or the rest of the load.' Plaintiff alleges that the provision contemplates the completion of existing work, not an indefinite obligation to search for additional work until management later decided the workday had ended.

50. Plaintiff alleges that Defendant improperly treated the Incidental Overtime provision as an independent source of authority to extend employees' scheduled workdays indefinitely. Plaintiff alleges that the provision addresses circumstances in which

employees may work beyond their scheduled hours and the compensation and limitations applicable to such work, but does not authorize Defendant to disregard the separate contractual procedures governing work schedules, changes in work hours, or overtime assignments contained elsewhere in Appendix J.

r r r

51. The Company attempts to characterize the absence of a Release Page as an overtime assignment. Plaintiff alleges that the absence of a communication ending the workday is not itself an assignment of work under Appendix J.
52. Plaintiff alleges that AT&T did not issue individual overtime assignments each day that employees worked beyond their posted schedules. Rather, management relied upon prior coaching discussions to establish an ongoing expectation that Premises Technicians would continue dispatching themselves to additional work after completing their scheduled assignments until management later issued a Release Page. Plaintiff alleges that the Company thereby attempted to convert what the Collective Bargaining Agreement treats as recurring scheduling and assignment decisions into a single, indefinite management directive that remained in effect every subsequent workday.
53. Plaintiff alleges that both "scheduled" overtime and "assigned" overtime under Appendix J involve affirmative Company actions. Neither provision states that employees shall infer assignments from the absence of a Release Page. That language does not appear in the Collective Bargaining Agreement.

r r d r

54. Plaintiff further alleges that coaching discussions are intended to address employee performance, not to amend the terms of a collectively bargained agreement or create permanent directives governing future work schedules. By relying upon prior coaching discussions as continuing authority to require employees to work beyond their posted schedules indefinitely, Defendant bypassed the recurring scheduling, notice, assignment, and compensation procedures negotiated in Appendix J.
55. Plaintiff further alleges that the coaching discussions did not identify specific overtime assignments, but instead purported to establish a continuing obligation to work beyond

posted schedules whenever a Release Page had not yet been issued. The coaching discussions thus became the substitute for the assignment that Appendix J requires.

M M

M

56. AT&T maintained formal systems for assigning overtime opportunities to employees, including an automated system known as the Canvas Assign Tool.
57. According to Defendant's own materials, the Canvas Assign Tool allowed management to create overtime assignments, apply contractual labor agreement rules, identify eligible employees, establish assignment dates and deadlines, and electronically communicate overtime opportunities.
58. Plaintiff alleges that these formal assignment procedures demonstrate that AT&T understood how overtime assignments were properly communicated to employees through identifiable management actions.
59. The daily Release Page practice differed fundamentally from these formal assignment procedures. Employees did not receive an individualized overtime assignment identifying the work to be performed, the anticipated duration, or the contractual authority under which the assignment was made.
60. Instead, employees completed their scheduled assignments and were expected to continue selecting additional work from the available dispatch pool until management later issued a Release Page indicating that no additional work remained available for dispatch.
61. Plaintiff alleges that the absence of a Release Page did not itself constitute an overtime assignment. Rather, employees were expected to infer an ongoing obligation to continue extending their workday solely because management had not yet issued a communication ending the practice.
62. Plaintiff alleges that converting the absence of a Release Page into an indefinite obligation to continue extending employees' scheduled workday was materially different from issuing an actual overtime assignment under the Collective Bargaining Agreement.
63. Plaintiff alleges that Defendant attempted to convert what the Collective Bargaining Agreement treats as recurring scheduling and overtime decisions into a single, indefinite

management directive communicated through coaching discussions rather than through the contractual procedures governing work schedules, changes in work hours, or overtime assignments.

M M

64. During the grievance process, Defendant was asked to explain the distinction between "scheduled" overtime and "assigned" overtime under Appendix J. Defendant responded that scheduled overtime is "foreseen overtime (i.e., 6th day)," while assigned overtime is "incidental unforeseen overtime." (See Defendant's March 20, 2023 Response to CWA Request for Information, RFI #110163.)
65. Defendant's interpretation establishes a two-tier system of additional work. Work anticipated in advance is formally scheduled as sixth-day overtime. Daily extensions of employees' posted work schedules, however, are classified as "incidental" so they need not be scheduled as changes in work hours or communicated through identifiable overtime assignments. Plaintiff alleges that nothing in Appendix J authorizes this distinction.
66. The Release Page practice did not operate by informing employees that additional work had been assigned beyond their scheduled workday. Instead, employees were expected to disregard the posted end of their scheduled shift and continue obtaining additional work unless and until management later issued a Release Page. Plaintiff alleges that the absence of a Release Page was treated as though it automatically extended the employee's scheduled workday, even though no affirmative communication changing the employee's work hours had been issued.
67. Plaintiff further alleges that this practice was materially different from the manner in which scheduled start times operated. Employees were expected to report at the beginning of their scheduled shifts unless management affirmatively changed the schedule. The absence of a communication before the scheduled start time did not authorize employees to begin working earlier. Plaintiff alleges that Defendant applied a different and unwritten rule only to the end of the scheduled workday by treating the absence of a Release Page as authority to continue working beyond the posted schedule.

68. Plaintiff alleges that Defendant gave binding effect to the posted start time of the work schedule while refusing to give the same effect to the posted end time, even though both times were established through the same Work Schedules provision of Appendix J.
69. Plaintiff alleges that if the absence of a Release Page could operate as an automatic extension of the scheduled workday, then the posted end time ceased to function as a fixed contractual work schedule. Instead, the actual duration of the workday became dependent upon an unwritten management practice rather than the schedule posted pursuant to Appendix J.
70. Defendant's interpretation effectively removes recurring extensions of employees' scheduled workdays from the contractual provisions governing work schedules and changes in work hours. By characterizing every daily extension as "incidental," Defendant treated recurring schedule extensions as though they never constituted changes in work hours, regardless of how frequently they occurred.
71. Defendant further characterized these daily extensions as "overtime." Appendix J, however, provides that employees scheduled to work overtime will be paid in accordance with applicable Federal and State law. Under the Fair Labor Standards Act, hours worked before forty (40) hours in a workweek are compensated at straight time, not an overtime premium. Accordingly, the daily extensions at issue remained straight-time work hours until the statutory threshold was reached.
72. Because those additional hours remained straight-time hours until the forty-hour threshold was met, Defendant first altered Plaintiff's scheduled straight-time workday before any overtime compensation issue existed. Plaintiff therefore alleges that Defendant could not avoid the contractual provisions governing work schedules and changes in work hours simply by labeling those straight-time schedule extensions as "incidental overtime."

r

73. Throughout Plaintiff's employment as a Premises Technician in Texas, AT&T expected Plaintiff and other Premises Technicians to continue dispatching and performing work after the end of their posted shifts until management issued an "All Clear" or "Release Page." Employees were not informed before the end of their scheduled shift whether they would be required to continue working, how long the additional work would last, or how many additional hours would be required.

74. Rather than assigning overtime or extending an employee's scheduled work hours before the end of the shift, AT&T expected technicians to continue searching for and dispatching themselves to additional work from the available work pool until management determined that sufficient work had been completed for the day. The Release Page typically consisted of a text message or email issued by Load Balance Managers rather than by employees' immediate supervisors.

r r d

75. Because AT&T continued accepting same-day customer appointments throughout the day, the available work pool could increase rather than decrease. This practice, referred to by management and employees as maintaining "open clocks," allowed additional work to be added to the dispatch system after technicians had already begun their scheduled workdays. As technicians completed assignments, additional work frequently entered the dispatch system. Employees therefore had no objective or contractual way of determining when their workday would end or whether additional work would continue to be expected after their scheduled shift.

76. When technicians asked management when "open clocks" would end or when additional work would no longer be expected, management did not provide objective criteria or a defined stopping point. Instead, the conclusion of the workday depended entirely upon management's issuance of a Release Page. Employees were not informed before reporting to work whether their scheduled workday would be extended, nor were they notified during the workday that their scheduled hours had changed or that overtime had been assigned.

77. Upon receiving a Release Page, technicians were instructed to contact their supervisor before ending their workday. Plaintiff alleges that, in practice, technicians routinely

concluded their workday after receiving the Release Page without speaking directly to a supervisor and that Plaintiff is unaware of any employee being disciplined solely for failing to make such a call.

d

78. Plaintiff alleges that Defendant attempted to transfer the contractual responsibility for determining and communicating changes to employees' work schedules onto the employees themselves by requiring them to continue searching for work until affirmatively told to stop. Appendix J places that responsibility on the Company, not the employee.
79. Because these additional hours did not appear on employees' posted work schedules, employees could not request vacation leave, paid time off, or other approved leave for those hours in advance. Plaintiff alleges that the duration of this additional work depended entirely upon management's operational decisions and varied from day to day. As a result, employees could not reasonably plan personal obligations after the end of their posted work schedules because they had no way of knowing whether management would require them to continue working. Plaintiff further alleges that Defendant's practice effectively deprived employees of the practical ability to exercise contractual rights associated with their posted work schedules, including requesting leave or making personal commitments in reliance upon the schedules the Company itself had determined and posted.
80. Plaintiff further alleges that the Release Page practice deprived Premises Technicians of the practical benefit of other rights negotiated in Appendix J. Because employees could not know whether their scheduled workday would be extended, they could not reliably plan personal obligations occurring after their posted shifts or effectively utilize contractual leave options, including Personal Days that Appendix J permits employees to use in two-hour increments. Plaintiff alleges that the value of those negotiated rights depended upon employees being able to rely upon the work schedules the Company had determined and posted.
81. Plaintiff further alleges that, under the Release Page practice, an employee who wished to be certain of leaving at the end of the posted schedule had no meaningful contractual

mechanism to do so. An employee could avoid the practice only by not reporting to work at all or by requesting leave for hours that already appeared on the posted schedule, even though the employee sought only to work the hours the Company had originally determined and posted. Plaintiff alleges that the Company thereby conditioned an employee's ability to leave at the end of the posted workday upon management's discretion rather than upon the work schedule established under Appendix J.

82. Plaintiff alleges that the Release Page practice effectively displaced the contractual Change-of-Hours procedure. During discovery, Defendant admitted that no employee in the Fort Worth area had received compensation under the EXTS payment code associated with the Change-of-Hours premium. (See Defendant's Response to Request for Information No. 110185, Response No. 6.) Plaintiff alleges that, rather than utilizing the contractual procedures governing changes in work hours, AT&T relied upon the Release Page practice to extend employees' workdays without invoking the negotiated notice and premium-pay provisions of Appendix J.

r

83. Plaintiff further alleges that the practice was applied inconsistently. According to Plaintiff, other Premises Technicians were at times permitted to leave before a Release Page was issued with managerial approval, while Plaintiff was later disciplined after completing his posted work schedule.

r r

84. Plaintiff alleges that the Release Page practice was an unwritten management practice rather than a procedure contained in the Collective Bargaining Agreement or any written Company policy provided to Plaintiff. Plaintiff was never provided with a written policy, training material, or operational guideline explaining the Release Page practice, including when employees were required to continue working beyond their scheduled shifts, how additional work would be assigned, when the obligation ended, or the contractual authority for the practice.

85. Plaintiff alleges that the only explanation he received regarding the Release Page practice came through coaching discussions in which management stated that Plaintiff was

expected to comply with the Technician Expectations concerning incidental overtime. Plaintiff alleges that those coaching discussions did not explain the Release Page practice itself, identify any written policy governing the practice, or explain how the practice operated in conjunction with Appendix J.

86. Plaintiff further alleges that Defendant used those coaching discussions not merely to address a discrete performance issue, but to communicate an ongoing operational requirement that employees continue searching for and requesting additional work after the completion of their scheduled shifts until management later issued a Release Page. Plaintiff alleges that Defendant thereby attempted to establish an indefinite management directive through verbal coaching discussions rather than through the scheduling and assignment procedures negotiated in Appendix J.

M

87. During Plaintiff's employment, AT&T routinely offered customer appointment windows extending until approximately 8:00 p.m. At that time, Premises Technicians assigned to the AM shift were generally scheduled to end their workday at approximately 4:30 p.m. Plaintiff alleges that this created a recurring gap of several hours between the Company's scheduled customer commitments and the technicians' posted work schedules.

88. Plaintiff filed grievances challenging this practice. Plaintiff alleged that when the Company knowingly accepted customer appointments extending beyond the scheduled workday, the resulting additional work could not reasonably be characterized as incidental or unforeseen. Rather, Plaintiff alleged that the Company had already planned work extending beyond the posted schedules but chose not to schedule or assign those hours in accordance with Appendix J.

89. Plaintiff further alleged that the Company instead relied upon the Release Page practice to require technicians to continue working beyond their scheduled end times without issuing revised work schedules, providing Change of Hours notice, or making identifiable overtime assignments. Plaintiff alleges that this practice allowed the Company to continuously extend employees' workdays while avoiding the contractual procedures governing scheduled work hours.

90. The Union did not pursue Plaintiff's grievance and ultimately advised Plaintiff that it had been dismissed because of a "clerical error." Plaintiff alleges that this explanation was inadequate and that the grievance was never decided on its contractual merits.
91. After Plaintiff raised these concerns, the Company later implemented a PM shift for Premises Technicians. Plaintiff alleges that the creation of the PM shift demonstrates that the Company recognized the operational need to staff customer appointments extending later into the evening.
92. Plaintiff further alleges that, notwithstanding the addition of the PM shift, AM shift technicians continued to be required to perform work associated with later appointment windows through the Release Page practice. Plaintiff alleges that this demonstrates the continued need for scheduled coverage extending beyond AM technicians' posted work hours and further supports Plaintiff's allegation that the work was planned operational coverage rather than incidental extensions of individual assignments.

93. Plaintiff alleges that AT&T management regularly received operational reports, including "Hours Per Tech" projections and other workload metrics, reflecting the anticipated labor hours required to complete the work assigned to the work group. Plaintiff alleges these reports frequently projected workloads that exceeded the total scheduled work hours available for the technicians assigned to the turf.
94. Plaintiff alleges that, despite possessing advance information indicating that the scheduled workforce would likely be insufficient to complete the projected workload during scheduled hours, AT&T did not adjust posted work schedules, assign overtime pursuant to Appendix J, or otherwise invoke the contractual procedures governing changes in work hours. Instead, AT&T relied upon the Release Page practice to require Premises Technicians to continue performing work beyond their scheduled shifts.
95. Plaintiff further alleges that the work performed after scheduled shifts frequently consisted of new work identified through the dispatch system only after technicians had completed the assignments originally scheduled for that day. Rather than limiting additional work to completing an existing assignment, Defendant expected technicians to

continue searching for additional work, or request additional work from Load Balance Management when none appeared, until management later determined the workday had ended.

96. Plaintiff further alleges that remaining beyond scheduled work hours was an ordinary and recurring feature of the Premises Technician workday during Plaintiff's employment rather than an isolated response to unusual business circumstances.

97. Plaintiff alleges that the Release Page practice was not limited to completing work already in progress at the end of a scheduled shift. Instead, technicians who had completed all work originally provided during their scheduled hours were expected to continue searching for additional work and begin entirely new customer jobs after their posted schedules had ended.

98. Plaintiff further alleges that operational workload projections were routinely prepared in advance and frequently reflected labor requirements exceeding employees' posted schedules. Plaintiff alleges these projected workloads were known to management before the workday concluded and, in many instances, before the workweek began.

99. Throughout Plaintiff's employment, AT&T relied upon an internal document entitled AT&T Field Services Technician Expectations to communicate operational expectations for Field Services Technicians.

100. The Technician Expectations expressly provide that they are "not intended to change, alter or supersede existing contractual provisions," and further state that they are intended to ensure compliance with applicable federal, state, and local laws, Company policies, and the Collective Bargaining Agreement.

101. Plaintiff alleges that, notwithstanding those disclaimers, AT&T relied upon the Technician Expectations to enforce a Release Page scheduling practice that was not contained within Appendix J of the Collective Bargaining Agreement.

102. The Technician Expectations state: "Based on the needs of the business it may be necessary to work incidental overtime to complete a current job and/or the rest of the load."

103. Plaintiff alleges that the Release Page practice did not operate in the manner described by the Technician Expectations. Rather than affirmatively assigning additional work, extending employees' scheduled work hours, or scheduling overtime, AT&T required Premises Technicians to determine for themselves whether additional work remained by repeatedly searching the dispatch system after their scheduled shifts had ended. If no work was available, technicians were expected to contact Load Balance and request additional assignments until management later issued a Release Page.

104. Plaintiff further alleges that, during his employment, remaining beyond scheduled work hours was not an occasional response to unusual business needs but an ordinary and recurring expectation of Premises Technicians. Plaintiff therefore alleges that the practice functioned as a routine scheduling system rather than incidental overtime as described in the Technician Expectations.

105. Plaintiff further alleges that the issuance of a Release Page did not signify that the remaining workload had been completed. Rather, it signified only that management had finished dispatching available work. Technicians remained in the field completing assignments after Release Pages were issued. Plaintiff therefore alleges that the Release Page practice did not correspond to the circumstances described in the Technician Expectations.

106. The policy lacked objective standards and permitted managers to determine, after the fact, which employees would be expected to continue working beyond their scheduled shifts and which employees would not. Plaintiff alleges that this unfettered discretion resulted in inconsistent enforcement among similarly situated Premises Technicians.

107. According to Plaintiff, the Technician Expectations do not define how the Release Page practice operates, when technicians become obligated to continue performing work beyond their scheduled shifts, how long that work may continue, or how the practice complies with the scheduling and overtime provisions contained in Appendix J.

108. Plaintiff further alleges that the Technician Expectations expressly disclaim any intent to modify contractual scheduling provisions, yet AT&T relied upon the Release Page practice as the basis for disciplining and ultimately terminating Plaintiff.

109. The Technician Expectations also state: "No one has the authority to direct any employee to violate the law, the Company's Code of Business Conduct, or the Company's policies."

110. The Technician Expectations contain a section titled "General Expectations" which states as its very first provision: "Technicians are responsible for checking their work schedule or calling the supervisor to verify updates and changes. Technicians are required to abide by their work schedule and report at the start of their workday prepared to work."

111. The same document expressly directs employees to abide by their schedule in the absence of updates and changes.

112. The Technician Expectations do not define "incidental overtime." They do not explain how a technician is to determine when incidental overtime "may be necessary." They do not describe when management must assign additional work, when a technician's scheduled workday has been extended, or under what circumstances technicians are expected to continue accepting work beyond their posted schedules. They likewise contain no examples of conduct that would constitute a violation of the "Incidental Overtime" provision.

113. Plaintiff alleges that the AT&T Field Services Technician Expectations applied to multiple technician classifications covered by different collective bargaining provisions. Plaintiff further alleges that Premises Technicians were the only employees subject to those Expectations who were governed by Appendix J, which contains materially different provisions governing work schedules, changes in work hours, and overtime than those applicable to technician classifications covered by Appendix C. Plaintiff alleges that AT&T nevertheless enforced the Technician Expectations against Premises Technicians by applying operational practices more consistent with Appendix C's treatment of work beyond scheduled tours while failing to utilize the scheduling, notice, and Change-of-Hours procedures negotiated specifically for Appendix J employees.

114. Plaintiff alleges that Premises Technicians covered by Appendix J were required to operate under daily work practices that resembled those used for technician classifications governed by Appendix C, while AT&T simultaneously denied Premises Technicians the scheduling protections specifically negotiated in Appendix J. Plaintiff further alleges that Defendant selectively relied upon operational concepts reflected in Appendix C without following either Appendix C's affirmative assignment framework or Appendix J's separate procedures governing work schedules, changes in work hours, and overtime.

115. Plaintiff further alleges that, during his employment, he never completed a workweek without being required to work some form of incidental overtime. A practice that occurred weekly, and frequently more often, cannot reasonably be characterized as "incidental" in the ordinary sense of the word. Plaintiff therefore alleges that the Release Page practice functioned as a routine scheduling practice rather than incidental overtime as described in the Technician Expectations.

MM

116. Plaintiff alleges that the uncertainty created by the Release Page practice caused significant stress and anxiety. Because Plaintiff could not know when his workday would actually end, he experienced increasing difficulty planning his daily activities, obtaining adequate rest, and managing his health.

117. Plaintiff raised concerns on multiple occasions that the term "release" was harmful and degrading. Plaintiff explained to management and union representatives that the word "release" carries connotations that are deeply negative when applied to human beings: slaves are released, prisoners are released, wild animals are released, and criminals are released from custody. Plaintiff felt that being "released" at the end of the workday made him feel discarded—as though he had no rights and worked until his "master" decided to release him. Plaintiff argued that the Collective Bargaining Agreement never authorized this language or the practice it represented. Plaintiff had

work schedule rights—a negotiated agreement on how and when he would work. He was not property to be released.

118. During a meeting with management and union representatives, Plaintiff discussed these concerns in detail. Manager Jody Chapman responded that the term would not change because it was part of operational necessities. Plaintiff alleges that the following day, the "Release Page" no longer used the word "release." The Company began using alternative language such as "All Clear" or directing technicians to contact their manager via email. Plaintiff alleges that the Company's decision to change the terminology—even after Jody Chapman had insisted it would not change—demonstrated that management understood the term was harmful, yet refused to acknowledge the underlying practice.

119. Plaintiff further alleges that the use of the word "release," and the Company's refusal to address the underlying practice, contributed to his depression. The language reinforced the message that Plaintiff was merely a tool to be used and then discarded—that he had no right to his own time or schedule, despite the Collective Bargaining Agreement providing otherwise. Plaintiff alleges that this ongoing psychological harm is directly relevant to his ADA claim, as it was a recurring source of stress and depression that the Company refused to address.

120. Plaintiff's stress and anxiety substantially limited one or more major life activities, including sleeping, concentrating, thinking, and managing daily activities, constituting a disability under the ADA.

121. On October 16, 2024, Plaintiff sent management the following written communication:

"Due to stress and for my health, safety and well-being I will be returning to the way I worked for this company for more than seven years, with the exact same company Field Technician Expectations and the same contract language pertaining to scheduling and overtime. If you have any unexpected work hour changes or new overtime assignments, please inform me on a day-to-day basis."

122. Plaintiff alleges this communication requested a reasonable accommodation consisting of predictable scheduling and advance notification of additional work consistent with the Collective Bargaining Agreement.

123. Plaintiff further alleges that his request did not seek exemption from work or overtime assignments. Rather, Plaintiff requested that any additional work be communicated and assigned through the procedures established by Appendix J.

124. Plaintiff's accommodation request did not seek to eliminate overtime or exempt him from legitimate work assignments. Rather, Plaintiff requested that any work beyond his scheduled hours be communicated and assigned through the scheduling and overtime procedures already established by the Collective Bargaining Agreement so that he could manage his medical condition while continuing to perform the essential functions of his position.

125. AT&T did not engage Plaintiff in an interactive process regarding this request and did not propose an alternative accommodation. Instead, management continued to require Plaintiff to follow the Release Page practice.

M

M

126. As the Release Page practice continued, Plaintiff repeatedly informed management that the uncertainty surrounding the end of the workday was causing significant stress and interfering with his ability to plan his daily activities.

127. Plaintiff advised management that he was not requesting to avoid work. Rather, Plaintiff requested that any work beyond his posted schedule be scheduled or assigned through the procedures already contained in the Collective Bargaining Agreement.

128. Plaintiff further advised management that receiving notice of additional work before the conclusion of his scheduled shift would allow him to better manage his health while continuing to perform his job.

129. Plaintiff alleges that management declined to implement those requests and instead continued requiring Premises Technicians to continue accepting and performing work beyond the end of their scheduled shifts through the Release Page practice.

130. For approximately two years before his termination, Plaintiff repeatedly raised concerns regarding the Release Page practice with supervisors, labor relations personnel, and Union representatives.

131. Plaintiff consistently maintained that Appendix J required AT&T to determine and post employee work schedules, provide notice when work hours changed, and schedule or assign overtime in accordance with the Collective Bargaining Agreement.

132. Plaintiff also repeatedly informed management that the uncertainty created by the Release Page practice was adversely affecting his health and requested that management provide notice whenever additional work would be required.

133. Plaintiff repeatedly asked management under what contractual authority Premises Technicians were required to continue working beyond their scheduled shifts and whether the Change-of-Hours provisions of Appendix J applied. Plaintiff alleges that management did not identify any provision of the Collective Bargaining Agreement authorizing the Release Page practice or requiring employees to continue working beyond their posted schedules without an individualized assignment or change in work hours.

134. Plaintiff alleges that these complaints concerned both his health and his contractual working conditions.

135. Plaintiff alleges that he repeatedly challenged these practices through grievances, discussions with management, and communications with the Union over a period of years. Plaintiff alleges that these complaints consistently concerned the Company's failure to follow the scheduling provisions of Appendix J.

136. Plaintiff further alleges that many of the operational concerns raised in those grievances were later addressed by changes in the Company's operations, including the implementation of later shifts. Plaintiff alleges that, rather than acknowledging the contractual issues he raised, management increasingly viewed Plaintiff as an employee who persistently challenged established practices.

137. Plaintiff therefore alleges that the disciplinary actions culminating in his termination were motivated, at least in part, by his repeated efforts to challenge and oppose the Company's scheduling practices and enforce the Collective Bargaining Agreement.

138. On October 16, 2024, Plaintiff sent management an email explaining that, because of the stress created by the Release Page practice, he intended to return to working under the scheduling procedures that had governed his employment for many years.

139. Plaintiff stated that if management required additional work beyond his scheduled hours, management should notify him on a day-to-day basis so that the work could be scheduled or assigned accordingly.

140. Plaintiff alleges that this communication constituted both a request for reasonable accommodation under the ADA and a good-faith request that AT&T administer employee schedules in accordance with the Collective Bargaining Agreement.

141. Rather than modifying the scheduling practice or discussing Plaintiff's request, management scheduled Plaintiff for a coaching meeting.

## M

142. On October 18, 2024, management held a coaching meeting with Plaintiff regarding his concerns.

143. During that meeting, management instructed Plaintiff that he was expected to continue accepting and performing work after the conclusion of his scheduled workday until a Release Page had been issued.

144. Plaintiff again explained that the uncertainty associated with the Release Page practice was affecting his health and requested that any additional work be scheduled or assigned before the conclusion of his scheduled shift.

145. Plaintiff alleges that management declined to utilize the scheduling procedures contained in the Collective Bargaining Agreement.

146. Following the meeting, Plaintiff sent management a written email stating, in relevant part:

"According to the coaching meeting that I was in this morning I will not receive any daily notice of any unexpected additional hours I am expected to work. I was given a blanket directive to follow a manager created verbal directive instead as a term of employment. I am informing management that I believe that this is an unsafe directive and creates a hostile work environment and is intended to take the place of provisions in the labor agreement."

147. Plaintiff alleges that this email constituted both a request for reasonable accommodation under the ADA and protected activity asserting rights under the Collective Bargaining Agreement.

148. Plaintiff further advised management that he intended to continue working the posted schedule determined by the Company. Plaintiff requested that, if management required him to work beyond his scheduled hours, it notify him before the conclusion of his scheduled workday in accordance with the procedures established by the Collective Bargaining Agreement.

149. October 21, 2024, was the first day of Plaintiff's scheduled workweek.

150. At the beginning of that workday, Plaintiff had not yet worked any hours during the workweek.

151. Appendix J provides that employees scheduled or assigned overtime will be compensated in accordance with applicable federal and state law. Likewise, the Technician Expectations expressly state that they are not intended to alter contractual provisions or applicable law.

152. Nevertheless, AT&T characterized work beyond Plaintiff's scheduled shift on October 21 as "Incidental Overtime."

153. Plaintiff alleges that management did not extend Plaintiff's posted schedule, assign overtime before the conclusion of Plaintiff's scheduled shift, notify Plaintiff that his work hours had changed, or otherwise invoke the contractual procedures governing overtime assignments.

154. Instead, Plaintiff alleges that AT&T relied upon the Release Page practice to require Plaintiff to continue performing work beyond the end of his posted schedule without first extending his scheduled work hours or assigning overtime pursuant to Appendix J.

155. Plaintiff completed his scheduled workday in accordance with the hours previously posted by AT&T.

156. Plaintiff alleges that AT&T later relied upon Plaintiff's completion of his scheduled workday as one of the principal reasons supporting disciplinary action and his eventual termination.

157. Under the Fair Labor Standards Act (FLSA), overtime is defined as hours worked in excess of 40 in a single workweek. On October 21, 2024, Plaintiff had not yet reached the 40-hour threshold for overtime. It was factually impossible for Plaintiff to refuse "overtime" on the first day of a workweek, because no overtime existed at that time.

158. Nevertheless, AT&T characterized the post-shift work as "incidental overtime" and disciplined Plaintiff for refusing to work "overtime" that did not exist.

M M

159. Following the events of October 18 and October 21, 2024, AT&T initiated disciplinary proceedings against Plaintiff.

160. Plaintiff alleges that AT&T based its disciplinary decision upon Plaintiff's completion of his posted work schedule without continuing to search for, request, and perform additional work after his scheduled workday had ended.

161. On or about October 22, 2024, management prepared a Separation Proposal recommending that Plaintiff's employment be terminated. The Separation Proposal identified Plaintiff's October 18, 2024 email and his alleged failure to comply with the Field Services Technician Expectations concerning "Incidental Overtime" as the bases for that recommendation.

162. The Separation Proposal was submitted through Defendant's internal review process. Following that review, Labor Relations advised that it "will not stand in the way" of the recommendation, and Plaintiff's employment was thereafter terminated.

163. Plaintiff alleges that the reasons identified in the Separation Proposal and approved through Defendant's internal review process did not identify any provision of the Collective Bargaining Agreement that Plaintiff violated. Instead, Defendant relied upon the Technician Expectations and the unwritten Release Page practice in recommending and approving Plaintiff's termination.

164. Plaintiff further alleges that the Technician Expectations expressly state that they are not intended to alter or supersede existing contractual provisions, yet AT&T relied upon those Expectations rather than the scheduling procedures contained in Appendix J.

M

165. AT&T's Positive Discipline Policy (contained in Section 14F of the AT&T Southwest Supervisor's Manual, December 2017 revision) establishes three formal levels of discipline:

- Level One: Performance Notice
- Level Two: Written Reminder
- Level Three: Decision Making Leave

166. Section 3.2 of the Positive Discipline Policy states: "Employee discussion is the expected method for the supervisor to discuss work performance with the employee and r d r r ."

167. Section 3.2 further states: "A Performance Improvement Plan is d ."

168. Plaintiff further alleges that AT&T's stated reasons for termination were inconsistent with its own disciplinary policies.

169. During the review of Plaintiff's proposed termination, Lead Labor Relations Manager Guy Stewart stated:

"Labor will not stand in the way of the department's request to terminate this employee. It appears the progressive discipline did not work for this employee even after numerous discussions."

170. Plaintiff alleges that the reference to "numerous discussions" demonstrates that AT&T considered coaching discussions in evaluating whether progressive discipline had been successful.

171. Plaintiff further alleges that this characterization is inconsistent with the Company's written disciplinary policy, which expressly distinguishes coaching discussions from formal disciplinary action.

172. Plaintiff alleges that this inconsistency is relevant to whether AT&T followed its own disciplinary procedures in terminating Plaintiff.

173. Despite the clear language of Section 3.2, AT&T used these non-disciplinary coaching discussions as the sole predicate for Plaintiff's termination – the most serious form of discipline. This is a direct violation of the Company's own Positive Discipline Policy and constitutes evidence of pretext and bad faith.

M

174. On or about October 2, 2023, Plaintiff was placed on a Decision Making Leave ("DML").

175. The DML documentation stated that the Decision Making Leave would remain in effect until September 27, 2024.

176. During the DML period Plaintiff took Company-approved leave totaling approximately twenty-one consecutive calendar days.

177. Section 4.3 of the Positive Discipline Policy provides that a Decision Making Leave may be extended when an employee has been away from work for thirty consecutive calendar days or more.

178. Plaintiff alleges that he was absent for approximately twenty-one consecutive calendar days rather than the thirty consecutive calendar days referenced in the policy.

179. Nevertheless, AT&T extended Plaintiff's Decision Making Leave by approximately twenty-one days.

180. Plaintiff further alleges that, in submitting the recommendation for Plaintiff's termination, Defendant expressly represented to Labor Relations that Plaintiff "is currently not on COBC discipline." The Separation Proposal likewise identifies the events supporting the recommendation as occurring after Plaintiff had completed his Decision Making Leave.

181. Plaintiff alleges that Defendant nevertheless relied upon the extended Decision Making Leave and Plaintiff's prior disciplinary history in recommending Plaintiff's termination. Plaintiff further alleges that the extension of the Decision Making Leave was inconsistent with Section 4.3 of Defendant's Positive Discipline Policy because Plaintiff

had not been absent for thirty (30) consecutive calendar days, as required by the policy. Plaintiff therefore alleges that Defendant failed to follow its own disciplinary procedures.

182. Plaintiff alleges that the Decision Making Leave arose from an incident occurring on or about September 17, 2023. Prior to that incident, Plaintiff had been trained that when access necessary to complete a customer's work was unavailable—including situations where access depended upon a neighboring property—the appropriate procedure was to attempt access, wait approximately fifteen minutes, attempt access again, and, if access remained unavailable, advise the customer that the appointment would need to be rescheduled after the customer could ensure access was available. Plaintiff alleges that he followed this procedure throughout approximately seven years of employment without discipline.

183. On or about September 17, 2023, Plaintiff encountered a work location where access necessary to complete the work was unavailable because a neighboring property was secured, the neighboring resident was not home, and Plaintiff had been advised that an aggressive dog was present on the property. A duty manager instructed Plaintiff to follow a different procedure than the one Plaintiff had previously been trained to perform. Plaintiff requested clarification and asked whether additional training or instruction would be provided regarding the requested procedure because it differed from the training Plaintiff had previously received.

184. The communications between Plaintiff and the duty manager occurred primarily through text messages. The duty manager subsequently requested that Plaintiff participate in a telephone conversation. Plaintiff alleges that the duty manager had previously engaged in conduct toward employees that caused Plaintiff to have concerns about communicating privately with him. As a result, Plaintiff requested that a union representative, Michael Stinson, be present before participating in the telephone call. Mr. Stinson joined the call as a witness, and Manager Troxell was aware of his presence. After the union representative joined the call, the duty manager again instructed Plaintiff to follow a different procedure than the one Plaintiff had previously been trained to perform.

185. Plaintiff alleges that he did not refuse the manager's directive. Rather, Plaintiff advised that he was willing to perform the work but requested additional instruction before implementing a procedure that differed from the training he had previously received. Plaintiff again explained that he was not refusing the directive but was requesting guidance regarding the different procedure. The duty manager thereafter

advised Plaintiff that he would no longer be required to perform the work at issue and instead completed the work himself.

186. On September 17, 2023, after Plaintiff expressed his concerns regarding the directive, Manager Kain Troxell responded in writing, "Ok not a problem." Troxell further stated that he had attempted to call the numbers but received no answer and instructed Plaintiff to return and reschedule the appointment and advise the customer that access to the neighbor's backyard was required. Plaintiff alleges that this contemporaneous communication did not identify Plaintiff's conduct as a refusal to follow a management directive and instead reflected that the matter had been resolved by returning the appointment for rescheduling.

187. Plaintiff alleges that, notwithstanding Troxell's contemporaneous statement that Plaintiff's response was "not a problem," Defendant later characterized the September 17, 2023 incident as Plaintiff's failure or refusal to follow a management directive and relied upon that characterization in imposing the Decision Making Leave. Plaintiff alleges that this later characterization was inconsistent with the contemporaneous text communications concerning the incident.

188. Plaintiff further alleges that the distinction is significant because Plaintiff expressly stated in the contemporaneous text exchange that he was not refusing the directive and was requesting clarification regarding a procedure that differed from his prior training. Plaintiff alleges that the subsequent characterization of the incident as insubordination or failure to follow a directive omitted the context of his request for clarification and Troxell's contemporaneous response that the matter was "not a problem."

189. During the grievance process concerning the Decision Making Leave, Michael Stinson was brought into a grievance meeting and provided his account of the September 17, 2023 incident. Plaintiff alleges that Mr. Stinson's account was consistent with Plaintiff's account of the telephone conversation and the events surrounding the disputed directive. Plaintiff does not presently possess the notes or other documentation reflecting Mr. Stinson's testimony but alleges that the Company and Union had the opportunity to hear and consider his account during the grievance process.

190. Plaintiff later obtained, through a Request for Information submitted during the grievance of the Decision Making Leave, documents concerning the Company's "FX West Region Pilot – Neighbor CBR Look Up" trial. Plaintiff alleges that he was unaware of this trial program before the September 17, 2023 incident and would not have known of its existence but for the grievance process. Plaintiff further alleges that the trial documents did not instruct Field Technicians to call the neighboring property using the CBR telephone numbers and instead described a process involving SmartChat and Field Assistance/Support personnel, together with leaving a door hanger and JEPing the ticket for no access.

191. Plaintiff alleges that the trial documents therefore did not provide the written support for the directive that management had given him on September 17, 2023. Plaintiff further alleges that the Company did not provide him training concerning the trial procedure before disciplining him for not following the directive.

192. Plaintiff further alleges that, on December 15, 2023, after the DML had been imposed, Plaintiff presented a substantially similar no-access situation to his regular manager, Byron Majors. Plaintiff's regular manager instructed Plaintiff to "return to cx request later due date have the customer contact neighbor." Plaintiff alleges that this later instruction was consistent with the procedure Plaintiff had followed throughout his employment and differed from the procedure that had been the subject of the September 17, 2023 disciplinary incident. Plaintiff further alleges that Mr. Majors did not instruct Plaintiff to use the trial procedure, obtain CBR numbers, or call neighboring property owners.

193. Plaintiff alleges that these contemporaneous and subsequent communications demonstrate that the procedure Plaintiff followed on September 17, 2023 was not consistently treated by Company management as misconduct or as a refusal to follow a valid work directive. Plaintiff further alleges that the Company's later characterization of the incident omitted material context concerning Plaintiff's request for clarification, Troxell's response that the matter was "not a problem," the absence of training concerning the trial procedure, and the Company's subsequent continued use of the procedure Plaintiff had historically followed.

194. Several days later, Plaintiff was directed to attend a disciplinary meeting regarding the incident. Management questioned Plaintiff over the course of multiple meetings concerning whether Plaintiff had failed to follow a management directive. Throughout those meetings, Plaintiff consistently maintained that he had followed the training previously provided by the Company and that he had requested clarification before implementing a procedure that differed from his training. Plaintiff requested representation from the Union during the disciplinary process. Following the investigation, Defendant AT&T placed Plaintiff on a Decision Making Leave.

195. Plaintiff filed a grievance challenging the Decision Making Leave. During the grievance process, Plaintiff submitted a Request for Information seeking the written policy governing the procedure management claimed Plaintiff should have followed. In response, Defendant produced information indicating that the procedure management expected Plaintiff to follow was part of a trial or pilot program used in another area rather than the procedure on which Plaintiff had been trained. Plaintiff alleges that he had never been informed of that trial program before the incident and had not received training regarding its procedures.

196. During a subsequent grievance meeting, Plaintiff asked Area Manager Jody Chapman whether Plaintiff had been trained on or informed of the trial procedure before the September 17, 2023 incident. Plaintiff alleges that Mr. Chapman acknowledged Plaintiff had not previously received such training. Plaintiff therefore alleges that he was disciplined for failing to follow a procedure on which he had never been trained and that differed from the Company's established training previously provided to Plaintiff.

197. Plaintiff alleges that the "FX West Region Pilot – Neighbor CBR Look Up" document was not provided to Plaintiff before the September 17, 2023 incident and that Plaintiff was not informed that the procedure described in that document applied to him. Plaintiff obtained the document only after filing a grievance challenging the Decision Making Leave and submitting a Request for Information through the grievance process.

198. Plaintiff alleges that the trial document did not instruct Field Technicians to call neighboring property owners using the CBR telephone numbers. Rather, the document instructed the Field Technician, before the SmartChat CBR lookup process, to ask the

customer whether the customer could arrange access or had CBR telephone numbers for the neighbor and to knock on the entrance of the neighboring property. The document further provided that, if access remained unavailable, the Field Technician was to leave a door hanger, note the ticket with CBR information, and JEP the ticket for no access. The document separately described a SmartChat process through which authorized FLA or support personnel would perform the reverse-address lookup and provide resulting CBR telephone numbers to the Field Technician.

199. Plaintiff alleges that the trial document contains no instruction directing the Field Technician to call the neighboring property owner using the CBR telephone numbers, and Plaintiff alleges that the document provided no training, script, or instruction authorizing Plaintiff to make such calls. Plaintiff therefore alleges that the procedure for which he was disciplined was not the procedure described in the trial document later produced through the grievance process.

200. Plaintiff alleges that the September 17, 2023 communications demonstrate that Plaintiff did not refuse to perform work. Rather, Plaintiff expressed a concern about performing a procedure that differed from his prior training and requested clarification regarding the authority and procedure for performing that task. Plaintiff alleges that Manager Troxell did not identify any written policy, training material, or other instruction establishing that Plaintiff was required to make the requested calls.

201. Plaintiff further alleges that, on December 15, 2023, several months after the September 17, 2023 incident, Plaintiff presented a substantially similar no-access situation to his direct manager, Byron Majors. Plaintiff advised Manager Majors that he could not access a yard where the pole was located. Manager Majors instructed Plaintiff: "Ok, return to cx request later due date have the customer contact neighbor." (See Exhibit 23.)

202. Plaintiff alleges that Manager Majors' December 15, 2023 instruction is significant because it directed Plaintiff to follow the same general procedure Plaintiff had followed before the September 17, 2023 incident—return the request for a later due date and have the customer contact the neighbor—rather than directing Plaintiff to use the trial

procedure, obtain CBR information through SmartChat, or call neighboring property owners.

203. Plaintiff alleges that the documents and communications obtained during the DML grievance therefore demonstrate that the conduct for which Plaintiff was disciplined was based upon a directive that differed from the Company's established procedure previously followed by Plaintiff, was not identified in the trial document as a Field Technician requirement, and was not supported by training provided to Plaintiff. Plaintiff further alleges that the Company nevertheless characterized the September 17, 2023 incident as a failure to follow a management directive and relied upon that characterization in imposing the Decision Making Leave.

204. Plaintiff alleges that these facts were material to the merits of his DML grievance because they supported his contention that the discipline was imposed without just cause. Plaintiff further alleges that the Union possessed the Requests for Information, trial document, text messages, and other documentary evidence concerning these issues during its consideration of the grievance.

205. Plaintiff further alleges that the September 17, 2023 text messages demonstrate that Manager Kain Troxell directed Plaintiff to call four telephone numbers for access. Plaintiff responded that he was not refusing the directive and requested clarification and information showing that Premises Technicians were required to investigate other property owners' personal information to obtain access. Manager Troxell responded, "Ok not a problem," stated that he had attempted to call without receiving an answer, and directed Plaintiff to return to reschedule and advise the customer that access to the neighbor's backyard was required. (See Exhibit 22.)

206. On February 25, 2025, AT&T Labor Relations issued a written decision denying Plaintiff's grievance concerning the Decision Making Leave. In that decision, AT&T characterized the September 17, 2023 incident as one in which Plaintiff "was advised by the AT&T manager to smart chat in and advise of the situation," but asserted that Plaintiff instead "continued to argue with the manager on scope of work" and "ultimately left the job without completing his order." AT&T concluded that there had been no contractual violation and denied the grievance.

207. Plaintiff disputes AT&T's characterization of the events. Plaintiff alleges that he did not refuse the manager's directive or simply leave the job without explanation, but instead repeatedly requested clarification and training concerning a procedure that differed from the training previously provided to him. Plaintiff further alleges that the Company's subsequent production of information during the grievance process established that the procedure management expected Plaintiff to follow was associated with a trial or pilot program for which Plaintiff had not been trained or informed.

208. Plaintiff alleges that the February 25, 2025 decision reflects the Company's characterization of the incident as a refusal to follow management instructions while omitting material circumstances concerning Plaintiff's prior training, his requests for clarification and instruction, and the Company's use of a procedure for which Plaintiff alleges he had not been trained.

209. Plaintiff further alleges that, because his Decision Making Leave had concluded and Defendant acknowledged that Plaintiff was no longer on active COBC discipline, Defendant's Positive Discipline Policy required management to evaluate the subsequent incident under Section 4.2, including consideration of the seriousness of the conduct, the time since deactivation, whether a recurring pattern existed, Plaintiff's active disciplinary status, and any mitigating or aggravating circumstances before determining whether additional discipline, including dismissal, was appropriate. Plaintiff alleges that Defendant did not perform that evaluation. Instead, the recommendation to terminate Plaintiff was approved after Labor Relations concluded only that "the progressive discipline did not work for this employee even after numerous discussions," despite Defendant's written policy stating that coaching discussions are not part of the disciplinary process.

210. Before his termination, Plaintiff repeatedly challenged the Release Page practice through discussions with management and through the contractual grievance process.

211. Plaintiff consistently maintained that any work beyond the end of an employee's posted schedule should be scheduled or assigned pursuant to the procedures contained in Appendix J of the Collective Bargaining Agreement.

212. Plaintiff further asserted that when AT&T required employees to continue working beyond the end of their posted schedules, employees should receive the contractual notice and compensation applicable to changes in work hours under Appendix J.

213. Plaintiff alleges that those concerns were not resolved before his termination.

M M

214. During a grievance meeting following Plaintiff's October 2022 discipline, Manager Brandon Salee stated: "Technically we own you for up to 54 hours a week."

215. Plaintiff alleges that this statement reflected management's position that Premises Technicians were expected to continue performing work beyond the end of their scheduled shifts whenever management had not yet issued a Release Page, regardless of the scheduling procedures contained in Appendix J.

216. During a subsequent third-level grievance meeting, Plaintiff asked Director of Network Services Billy Maez whether employee hours had changed, referencing the notice provisions contained in Appendix J of the Collective Bargaining Agreement.

217. Mr. Maez responded: "Of course hours changed."

218. Plaintiff alleges that, notwithstanding that acknowledgment, AT&T neither provided the contractual notice associated with changes in work hours nor paid the contractual premium that Plaintiff contends is required when qualifying hour changes occur without the required notice.

219. Plaintiff timely filed grievances challenging both his Decision Making Leave and his subsequent termination through the grievance procedures established by the Collective Bargaining Agreement.

220. Throughout both grievance proceedings, Plaintiff presented the Union with provisions of Appendix J governing work schedules, changes in work hours, overtime assignments, and related compensation.

221. Plaintiff also provided the Union with Company policies, internal communications, text messages, management statements, grievance materials, Requests for Information, and other documentary evidence supporting his position.

r r M r

222. On February 25, 2025, AT&T Labor Relations denied Plaintiff's DML grievance and provided the Company's written account of the September 17, 2023 incident. AT&T characterized Plaintiff's conduct as arguing with management and leaving the job without completing the order, and asserted that there had been no contractual violation. Plaintiff disputes that characterization and alleges that the Company's account did not accurately reflect his repeated requests for clarification and training concerning a procedure that differed from his established training.

223. Plaintiff alleges that the grievance record subsequently contained documentary evidence concerning the procedure management expected Plaintiff to follow, including evidence that the procedure was associated with a trial or pilot program for which Plaintiff had not received training. Plaintiff further alleges that the Union possessed or had access to this evidence when evaluating whether Plaintiff's DML grievance should proceed to arbitration.

224. On April 11, 2025, CWA District 6, through Vice President Derrick Osobase, formally notified AT&T Southwest that the Union intended to arbitrate Plaintiff's Decision Making Leave grievance. The notice advised AT&T that the Union intended to arbitrate the Company's decision to place Plaintiff on a Decision Making Leave, asserted that the discipline was imposed without just cause, requested the selection of an arbitrator, and requested that AT&T "stop the clock" on the grievance. (See Exhibit 15.)

225. The Union's subsequent written communications confirmed that the April 11, 2025 notice reflected an actual Union recommendation that the grievance proceed toward arbitration. On July 14, 2025, CWA Staff Representative Jose Lozano advised Plaintiff in writing that "Your grievance was recommended for arbitration because I believe the company's action of placing you on the DML was without just cause." Mr. Lozano further explained that, before a case proceeds to an arbitrator, the CWA Arbitration Review Board reviews the case and makes the final determination as to whether the case should be arbitrated. (See Exhibit 16.)

226. Plaintiff alleges that these communications demonstrate that the Union had reviewed the DML grievance and determined that it presented sufficient grounds to warrant advancement toward arbitration, while recognizing that the Arbitration Review Board retained authority to make the final determination.

227. On July 14, 2025, Mr. Lozano responded in writing. Among other things, Mr. Lozano advised Plaintiff that "Your grievance was recommended for arbitration because I believe the company's action of placing you on the DML was without just cause." Mr. Lozano further explained that the CWA Arbitration Review Board would review the grievance and make the final determination as to whether the case should be arbitrated. He also advised Plaintiff that he was "not required to take any action" at that time because the grievance process was continuing and that Plaintiff would be notified of any meetings in which his grievance was presented. Mr. Lozano further advised that the documents submitted by the District Office to AT&T had been provided to Plaintiff. (See Exhibit 16.)

228. Plaintiff relied upon the Union's representations that the grievance had been recommended for arbitration, that the Union believed the DML was imposed without just cause, that the Arbitration Review Board would review the matter, and that Plaintiff was not required to take any additional action while the grievance remained pending. Plaintiff

therefore understood that the Union was continuing to pursue the grievance through the contractual grievance and arbitration process.

r

229. After previously notifying AT&T of its intent to arbitrate the Decision Making Leave grievance, the Union later determined that it would not proceed to arbitration. Plaintiff appealed that decision through each level of the CWA Internal Appeals Procedures.

230. Plaintiff alleges that the evidence obtained through the DML grievance demonstrated that the procedure management relied upon was not the procedure described in the "FX West Region Pilot – Neighbor CBR Look Up" document. Plaintiff further alleges that the trial document was not provided to Plaintiff until after he challenged the DML through the grievance process and submitted a Request for Information, and that Plaintiff would not have known of the trial or its procedures absent the grievance process.

231. Plaintiff alleges that the Union therefore possessed evidence directly relevant to whether the DML was imposed for just cause, including the trial document, Plaintiff's September 17, 2023 text messages with Manager Kain Troxell, Plaintiff's subsequent December 15, 2023 communication with his direct manager Byron Majors, and the Company's acknowledgment that Plaintiff had not previously been trained on the trial procedure.

232. Plaintiff alleges that the September 17, 2023 text messages show that Plaintiff did not refuse a management directive but instead expressly stated that he was not refusing the directive and requested clarification concerning a procedure that differed from his prior training. Plaintiff further alleges that Manager Troxell ultimately instructed Plaintiff to return and have the customer obtain access to the neighboring property.

233. Plaintiff further alleges that the December 15, 2023 communication with his direct manager, Byron Majors, independently demonstrates that management continued to direct Plaintiff to use the procedure he had previously followed rather than the trial

procedure, further supporting Plaintiff's contention that the September 17, 2023 discipline was not based upon a clearly established and uniformly applied work rule.

234. Plaintiff appealed the recommendation not to arbitrate to the District 6 Arbitration Review Panel, thereafter appealed to CWA President Claude Cummings, Jr., and finally appealed to the CWA Executive Board. On July 21, 2026, the Executive Board denied Plaintiff's appeal and advised Plaintiff in writing that he had exhausted the Union's Internal Appeals Procedures and that no further internal appeal was available to him as the grievant. (See Exhibit 11.)

235. Plaintiff alleges that, throughout the grievance and appeal process, he repeatedly advised the Union that the Decision Making Leave arose from Plaintiff following the Company's established training and that the procedure management expected Plaintiff to follow had been part of a trial or pilot program for which Plaintiff had never received training. Plaintiff further alleges that the Union possessed Requests for Information, management communications, text messages, and other documents supporting those contentions.

236. Plaintiff alleges that the Union initially determined that the Decision Making Leave grievance warranted arbitration, formally notified AT&T of its intent to arbitrate, and later declined to pursue arbitration without identifying any material change in the factual record, without addressing the evidence concerning Plaintiff's lack of training on the procedure at issue, and without explaining why the Union's earlier determination that the discipline was without just cause no longer applied.

237. The Union's December 16, 2025 decision denying arbitration does not discuss or distinguish the Union's April 11, 2025 notice to AT&T stating that it intended to arbitrate the grievance and asserting that the discipline lacked just cause. Nor does the December 16, 2025 decision address the July 14, 2025 written representation by Staff Representative Jose Lozano that the grievance had been recommended for arbitration because he believed the DML was imposed without just cause. Plaintiff alleges that the Union never explained the basis for its subsequent change in position or identified any material change in the factual record that caused it to abandon the position previously communicated to AT&T and Plaintiff.

d r r

238. Following Plaintiff's termination, Plaintiff timely filed Grievance No. D-022-24-ATTSW.

239. Throughout the grievance process, Plaintiff presented the Union with provisions of Appendix J governing work schedules, hour changes, overtime assignments, and related compensation.

240. Plaintiff also provided the Union with Company policies, internal communications, management statements, grievance materials, and documentary evidence supporting his position.

241. Plaintiff alleges that the Union did not meaningfully investigate whether the Release Page practice was consistent with the scheduling provisions contained in the Collective Bargaining Agreement.

242. Plaintiff further alleges that the Union did not interview relevant witnesses, request additional documentary evidence from AT&T, or meaningfully address the contractual provisions identified by Plaintiff.

243. On September 11, 2025, the Union declined to recommend Plaintiff's termination grievance to arbitration.

244. Plaintiff timely pursued every level of appeal available under the Union's Internal Appeals Procedures.

245. Throughout those appeals, Plaintiff continued providing documentary evidence and detailed written arguments supporting his position.

246. Plaintiff alleges that the Union's written decisions repeatedly characterized the dispute primarily as Plaintiff's failure to follow management instructions without substantively addressing Plaintiff's contention that the Release Page practice operated outside the scheduling procedures established by Appendix J.

247. Plaintiff alleges that the Union's handling of both grievances, including its investigation, evaluation, appeals, and ultimate refusal to pursue arbitration, was arbitrary, discriminatory, perfunctory, and/or in bad faith, and therefore breached its duty of fair representation.

M

248. As a direct and proximate result of Defendants' conduct, Plaintiff lost his employment with AT&T.

249. Plaintiff has suffered lost wages, lost employment benefits, lost retirement contributions, and other economic damages.

250. Plaintiff has further suffered emotional distress, anxiety, embarrassment, and other non-economic injuries.

251. Plaintiff continues to experience the financial and emotional consequences of Defendants' conduct.

M

M

d r

252. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

253. Plaintiff was a qualified individual with a disability within the meaning of the ADA because his stress and anxiety substantially limited one or more major life activities, including sleeping, concentrating, thinking, and managing daily activities.

254. AT&T knew of Plaintiff's disability and was aware that the unpredictable Release Page practice was exacerbating Plaintiff's condition.

255. Plaintiff requested a reasonable accommodation in the form of predictable scheduling and advance notice of any additional work beyond his scheduled hours consistent with the scheduling procedures contained in Appendix J of the Collective Bargaining Agreement.

256. Plaintiff's request did not seek exemption from performing assigned work or overtime. Rather, Plaintiff requested that any additional work be scheduled or assigned through the procedures already recognized by the Collective Bargaining Agreement.

257. AT&T failed to engage in the interactive process required by the ADA, denied Plaintiff's request, continued the challenged scheduling practice, and ultimately terminated Plaintiff's employment.

258. As a direct and proximate result of Defendant's actions, Plaintiff suffered lost wages, lost benefits, emotional distress, and other damages recoverable under the ADA.

259. Defendant's conduct violated 42 U.S.C. § 12112.

d r

260. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

261. Plaintiff engaged in protected activity by:

a. requesting a reasonable accommodation;

b. informing AT&T that the Release Page practice was adversely affecting his health;

c. requesting that additional work be scheduled or assigned in accordance with the Collective Bargaining Agreement;

d. opposing practices Plaintiff reasonably believed violated federal law and the Collective Bargaining Agreement; and

e. submitting written complaints regarding those practices.

262. AT&T knew Plaintiff had engaged in these protected activities.

263. AT&T took adverse employment actions against Plaintiff in response to his protected activities, including issuing disciplinary actions and ultimately terminating his employment.

264. The close temporal proximity between Plaintiff's protected activities and the adverse employment actions supports a direct inference of retaliation.

265. AT&T's stated reasons for terminating Plaintiff are pretextual.

266. Defendant's actions constitute retaliation in violation of 42 U.S.C. § 12203(a).

M M

d r

267. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

268. Plaintiff was a member of the bargaining unit and was covered by the Collective Bargaining Agreement between AT&T and the CWA. Plaintiff alleges that AT&T breached the Collective Bargaining Agreement and incorporated disciplinary policies by:

a. unilaterally implementing and enforcing the Release Page scheduling practice outside the scheduling procedures established by Appendix J;

b. failing to provide the notice required for changes in work schedules and work hours under Appendix J;

c. failing to pay the contractual Change-of-Hours premium provided by Appendix J when employees were required to work beyond their posted schedules;

d. extending Plaintiff's Decision Making Leave in violation of Section 4.3 of the Positive Discipline Policy, despite Plaintiff having been absent fewer than thirty consecutive calendar days;

e. after Plaintiff's Decision Making Leave had concluded, failing to evaluate Plaintiff's alleged performance issue under Section 4.2 of the Positive Discipline Policy, which requires management to consider the seriousness of the conduct, the time since deactivation, any pattern of similar conduct, active disciplinary status, and mitigating or aggravating circumstances before imposing additional discipline;

f. relying upon coaching discussions that the Supervisor's Manual expressly states are not part of the disciplinary process as a basis for Plaintiff's termination; and

g. terminating Plaintiff without just cause as required by the Collective Bargaining Agreement;

h. disciplining and terminating Plaintiff based upon alleged violations of the Field Services Technician Expectations and the unwritten Release Page practice without identifying any provision of Appendix J that Plaintiff allegedly violated, notwithstanding that Plaintiff's work schedules, changes in work hours, and overtime were governed by the Collective Bargaining Agreement.

269. AT&T's actions constituted a breach of the Collective Bargaining Agreement.

M

d

270. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

271. At all relevant times, Defendant CWA was Plaintiff's exclusive bargaining representative and owed Plaintiff a duty of fair representation enforceable in this action under Section 301 of the Labor Management Relations Act.

272. Plaintiff timely filed grievances challenging both his Decision Making Leave and his subsequent termination, each of which Plaintiff alleges presented meritorious claims under the Collective Bargaining Agreement.

273. The Union failed to represent Plaintiff fairly by:

a. failing to adequately investigate his grievances;

b. failing to process prior grievances challenging the Release Page policy;

c. refusing to advance his termination grievance to arbitration;

d. misrepresenting the facts and the Company's stated reasons for termination;

e. failing to engage with the substance of his legal and contractual arguments;

f. stonewalling his requests for grievance records;

g. failing to adequately investigate or consider the testimony of Michael Stinson, who was present during the telephone conversation concerning the disputed directive and subsequently provided his account during the grievance process;

h. recommending Plaintiff's Decision Making Leave grievance for arbitration and notifying AT&T on April 11, 2025 of the Union's intent to arbitrate the grievance, while later declining to advance the grievance without identifying any material change in the factual record;

i. representing to Plaintiff on July 14, 2025 that the DML grievance had been recommended for arbitration because the Union representative believed the Company's action was "without just cause";

j. representing to Plaintiff that he was not required to take further action while the grievance remained pending, thereby leading Plaintiff to understand that the Union was continuing to pursue the grievance through the contractual process;

k. failing to meaningfully address evidence that the DML arose from Plaintiff's following the Company's established training rather than refusing a management directive;

l. failing to meaningfully address evidence that the procedure management expected Plaintiff to follow was part of a trial or pilot program for which Plaintiff alleges he had never received training;

m. failing to adequately consider Requests for Information, text messages, management communications, and other documentary evidence supporting Plaintiff's position; and

n. ultimately declining to advance the DML grievance to arbitration after previously recommending that the grievance proceed toward arbitration, without adequately explaining the basis for that change.

274. Plaintiff alleges that the Union's actions described above were arbitrary, discriminatory, perfunctory, and/or taken in bad faith, constituting a breach of its duty of fair representation actionable in this hybrid § 301 proceeding.

M

d d

275. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

276. AT&T breached the Collective Bargaining Agreement as alleged in Count III.

277. Defendant CWA Local 6201 breached its duty of fair representation as alleged in Count IV.

278. Because the Union breached its duty of fair representation in handling Plaintiff's grievances concerning AT&T's alleged breaches of the Collective Bargaining Agreement, Plaintiff is entitled to maintain this hybrid § 301 action against both Defendants.

279. Plaintiff's hybrid § 301 claim consists of AT&T's alleged breaches of the Collective Bargaining Agreement and the Union's corresponding breach of its duty of fair

representation in processing and pursuing Plaintiff's grievances. Plaintiff does not allege that AT&T owed Plaintiff a duty of fair representation.

M

280. Plaintiff seeks the following categories of relief:

281. Lost wages and benefits from November 1, 2024, through the date of judgment, including all wage increases Plaintiff would have received had he not been terminated.

282. r Future lost wages to the extent reinstatement is not feasible.

283. Loss of pension contributions, health insurance, and other employment benefits.

284. r Two hours of straight-time pay for each unscheduled extension, calculated retroactively to March 23, 2022.

285. r Plaintiff experienced severe depression, anxiety, sleep disruption, difficulty concentrating, withdrawal from family, and loss of enjoyment of life.

286. d r Plaintiff experienced persistent feelings of sadness, hopelessness, and worthlessness during his employment.

287. Plaintiff lost interest in activities he previously enjoyed and was unable to be present and engaged with his wife and children.

288. r Plaintiff's professional reputation has been damaged by the circumstances of his termination.

289. Plaintiff seeks punitive damages against AT&T under the ADA based on AT&T's malicious or recklessly indifferent conduct. AT&T was aware of Plaintiff's health complaints and the harm its working conditions were causing. Instead of engaging in the interactive process, AT&T dismissed Plaintiff's concerns, provided only a hotline number, and ultimately terminated him. This conduct demonstrates, at minimum, reckless indifference to Plaintiff's rights. Punitive damages are subject to the statutory cap under 42 U.S.C. § 1981a(b)(3).

r d

290. Although Plaintiff is proceeding pro se at this time, Plaintiff reserves the right to seek recovery of all costs and expenses permitted by law, including filing fees, service costs, and other litigation expenses. Should Plaintiff retain counsel at any point in this litigation, Plaintiff further reserves the right to seek an award of reasonable attorneys' fees incurred for work performed by counsel, as authorized by the Americans with Disabilities Act and other applicable statutes.

d r r

291. Plaintiff seeks reinstatement to his former position as a Premises Technician, at the same work location, with full seniority restored. Plaintiff further seeks removal of all disciplinary records related to this case from his personnel file, and that Plaintiff shall be treated as if the unlawful termination and related disciplinary actions never occurred. In the alternative, if reinstatement is not feasible, Plaintiff seeks front pay in lieu thereof.

292. Plaintiff seeks a declaratory judgment that AT&T breached the Collective Bargaining Agreement under Section 301 of the Labor Management Relations Act and that Communications Workers of America, Local 6201 breached its duty of fair representation.

293. Plaintiff seeks an injunction requiring AT&T to comply with its obligations under the ADA and its own policies.

294. r d d r Plaintiff seeks pre- and post-judgment interest as allowed by law.

295. r Plaintiff seeks costs of court as permitted by statute and court rule.

r

296. If the trier of fact determines that AT&T required Plaintiff to perform work under operational requirements materially consistent with Appendix C rather than Appendix J, Plaintiff seeks any additional compensation, overtime premiums, or other contractual remedies to which he is entitled under applicable law and the governing collective bargaining agreements. If AT&T insists Plaintiff was expected to work exactly like an Appendix C technician, then AT&T cannot simultaneously deny Plaintiff the contractual benefits afforded to Appendix C technicians.

M

Plaintiff demands a trial by jury on all issues so triable.

d

/s/ *Josue Zavala*
Josue Zavala, Pro Se
1113 Churchill Rd.
River Oaks, Texas 76114
(619) 917-7416
Jdzvsg@yahoo.com

– EEOC Charge of Discrimination and Notice of Right to Sue

– Relevant Provisions of the Collective Bargaining Agreement (Appendix J)

– AT&T Field Services Technician Expectations

– October 16, 2024 Email from Plaintiff to Management

– October 18, 2024 Email from Plaintiff to Management

– AT&T Separation Proposal

– October 22, 2024 Labor Relations Review Email Chain

– Decision Making Leave Documentation

– Relevant Sections of the AT&T Southwest Supervisor's Manual

– Relevant Provisions of the CWA Constitution and Internal Appeals Procedures

– CWA Arbitration Review Decisions, Appeal Decisions, and Related Correspondence

– March 20, 2023 Response to CWA Request for Information No. 110163 (Scheduled vs. Assigned Overtime)

– March 23, 2022 Coaching Discussion (Release Page / Incidental Overtime)

– Defendant's Response to Request for Information No. 110185, Response No. 6 (EXTS / Change-of-Hours Compensation)

– April 11, 2025 – "Intent to Arbitrate" Letter (Derrick Osobase to AT&T)

– July 14, 2025 – Email from Jose Lozano to Josue Zavala

– July 6, 2025 – Email from Josue Zavala to Jose Lozano (request for process documentation)

– The "FX West Region Pilot" Documents

– M&P AT&T No Access Policy

– AT&T General Level Denial Letter – DML Grievance, February 25, 2025 (Guy Stewart to Jose Lozano)

– July 20, 2026 – Executive Board Decision (DML)

– Text Message Exchange Between Plaintiff, Witness Michael Stinson and Manager Kain Troxell – September 17, 2023

– Text Message Exchange Between Plaintiff and Manager Byron Majors – December 15, 2023

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § § § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 1**

**EEOC C ar e of Discri ination and Notice of Ri t to S e**

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| **CHARGE PRESENTED TO:** | **AGENCY CHARGE NO.** |
|---|---|
| EEOC | 450-2025-04773 |
| Texas Workforce Commission Civil Rights Division | |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Josue Zavala

Phone No.: 619-917-7416

Year of Birth:

Mailing Address: 1113 Churchill Rd

RIVER OAKS, TX 76114

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: AT T INC TX3901SWLO

No. Employees, Members: 101 - 200 Employees

Phone No.: 214.757.7577

Mailing Address: 3901 SW LOOP 820

FORT WORTH, TX 76133, UNITED STATES OF AMERICA

Name:

No. Employees, Members:

Phone No.:

Mailing Address:

DISCRIMINATION BASED ON:

Disability, Retaliation

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 10/16/2024

Latest: 11/01/2024

THE PARTICULARS ARE:

I.PERSONAL HARM:

A. I was placed in a hostile work environment after I made a complaint about the work schedule.

B. I reported to management that it caused me stress and anxiety.

C. The collective bargaining agreement was not followed, and I was terminated.

II.RESPONDENT'S REASON FOR ADVERSE ACTION:

A.None stated.

B.I was terminated on November 1, 2024.

III.DISCRIMINATION STATEMENT:

I believe that I was discriminated against based on disability, in violation of the Americans with Disabilities Act of 1990. I believe that I was retaliated against in violation of the Americans with Disabilities Act of 1990.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Josue Zavala
08/25/2025

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary ____________________

Printed Name ____________________

# CP Enclosure with EEOC Form 5 (06/24)

## Privacy Act Statement

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **Form Number/Title/Date.** EEOC Form 5, Charge of Discrimination (06/24).
2. **Authority.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.
3. **Principal Purposes.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.
4. **Routine Uses.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.
5. **Whether Disclosure is Mandatory; Effect of Not Giving Information.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## Notice of Right to Request Substantial Weight Review

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## Notice of Non-Retaliation Requirements

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Dallas District Office**
207 S. Houston Street, 3rd Floor
Dallas, TX 75202
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/25/2025

**To:** Josue Zavala
1113 Churchill Rd
RIVER OAKS, TX 76114
Charge No: 450-2025-04773

EEOC Representative and email: BILLIE CASHAW
EEO INVESTIGATOR
BILLIE.CASHAW@EEOC.GOV

---

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 450-2025-04773

On behalf of the Commission,

Digitally Signed By:Billie Cashaw
08/25/2025

For Travis Nicholson
District Director

**Cc:**
NA NA
AT T INC TX3901SWLO
3901 SW LOOP 820
FORT WORTH, TX 76133

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 450-2025-04773 to the District Director at Travis Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 450-2025-04773 to the District Director at Travis Nicholson, 207 S. Houston Street 3rd Floor, Dallas, TX 75202.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 2**

**Relevant Provisions of t e Collective Bar ainin A ree ent A endi J**

## 1.01 CLASSIFICATION

Premises Technician

Warehouse Assistant

Office Coordinator

Administrative Support Assistant

1.02 Wage Schedules for job titles shown in paragraph 1.01 preceding, shall be applied in accordance with Sections 1. and 2. of the Basis of Compensation Supplemental Statement set forth in this Appendix.

**APPENDIX J**

# SUPPLEMENTAL STATEMENTS SUMMARY

| STATEMENT NO. | TITLE |
|---|---|
| 1. | Classification of Employees |
| 2. | Basis of Compensation |
| 3. | Work Schedules |
| 4. | Holidays |
| 5. | Vacations |
| 6. | Personal Days |
| 7. | Absences from Duty |
| 8. | Transfers |
| 9. | Promotional Pay Treatment |
| 10. | Relief Differential |
| 11. | Travel |
| 12. | Force Adjustment |
| 13. | Subcontracting |
| 14. | Additional Payments |
| 15. | Work Apparel |
| 16. | Employment Security |
| 17. | Monitoring |
| 18. | Global Positioning System (GPS) |
| 19. | Home Dispatch |

new progression date shall be established in accordance with paragraph a. preceding.

Section 3. **Overtime**. Employees may be required to work overtime subject to the needs of the business. Employees scheduled to work overtime will be paid in accordance with applicable Federal and/or State Laws. Employees will not be scheduled or assigned overtime in excess of fourteen (14) hours in a work week unless either the employee consents to such overtime assignment or, as determined by management, there exists a service emergency (e.g., an event of national, state or local importance, fire, explosion, or other catastrophe, severe weather conditions, long-term service difficulties or an act of God, etc.).

Section 4. **Shift Differentials**. Employees who are scheduled to work an evening or night assignment in which more than fifty (50) percent of the time falls between the hours of 6:00 p.m. and 6:00 a.m., will receive a daily premium payment of ten (10) percent of their base wages for each day worked. Shift differentials will be included in the employee's rate of pay for purposes of computing payments during periods of vacation and holidays, if the following conditions are met: an employee works one (1) full work week of evening or night assignments before his/her vacation or holiday and is scheduled to work one (1) full work week of evening or night assignments, following his/her vacation or holiday.

Section 5. **Sunday Premium Payments**. Employees who work on a Sunday shall receive the rate of one and one-half (1½) times the employee's base wages, up to a maximum of eight (8) hours per day. Employees who are excused from work with pay during scheduled hours on Sunday shall be paid at straight time for the excused absence.

Section 6. **Meal Periods**. Unpaid meal periods will normally be scheduled for thirty (30), forty-five (45) or sixty (60) minutes, as determined by the Company.

## 3. WORK SCHEDULES

In lieu of Article VI, Hours of Work and Article VII, Work Schedules, of the 2017 Departmental Agreement, the following terms and conditions apply to Appendix J:

Section 1. **Work Schedules**. The Company will determine and post the work schedules. Insofar as the service requirements and abilities of the employees will permit, as determined by management, employee preference in order of seniority shall be taken into account in the assignment of tours. Employee' s scheduled work hours may start at any time of the day, on any day of the week and may be spread over any six (6) days of the week. Work schedules will be posted for a minimum period of one (1) week and are subject to change, with forty-eight (48) hours notice to the employee. All employees will have the opportunity to work thirty-two (32) hours in a week. Any time off from otherwise scheduled work will be counted toward the thirty-two (32) hours.

Section 2. **Change of Hours**. If an employee is notified less than twelve (12) hours before the originally scheduled start time of a change in work hours, the affected employee will receive two (2) hours of pay at the straight time rate.

Section 3. **Cancellation of Hours**.

a. If an employee is notified less than twelve (12) hours before the originally scheduled start time that the scheduled hours are canceled, the affected employee will receive two (2) hours of pay at the straight time rate.

b. If an employee begins work at the scheduled time on a scheduled workday the employee's scheduled workday cannot be canceled.

Section 4. **Split Workdays**. The Company may schedule employees to work a split workday. A split workday is a divided workday, with hours off in between.

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 3**

**AT&T Field Services Tec nician E ectations**

The following general expectations (Expectations) have been established for our Field Services technicians. This is not meant to be an exhaustive list, but rather guidelines to help complete daily assignments while meeting customer service requirements and service objectives.

Every Field Services technician is accountable for being familiar with and adhering to the Company's Code of Business Conduct (COBC) and these Expectations. Violations of the Code of Business Conduct or these Expectations may result in discipline, up to and including termination of employment.

These Expectations are intended to address and facilitate routine situations that arise on a regular basis. However, every situation must be assessed based on its own merits and supervisors have the discretion to determine what the appropriate course of action is depending on the situation. These Expectations are not intended to change, alter, or supersede existing contractual provisions, OSHA requirements, safety requirements, Company policies, Company Code of Business Conduct (COBC) and applicable federal, state, and local laws. No one has the authority to direct any employee to violate the law, the Company's Code of Business Conduct, or the Company's policies.

It is the supervisor's responsibility to ensure these Expectations are covered with each technician annually and with any new technician who is added to the workforce. For purposes of this document, "supervisor" is defined as your direct supervisor, or any other management employee designated by your direct supervisor as your direct supervisor's temporary delegate. These Expectations will be updated and revised as needed. If you have any questions regarding how to deal with a particular situation, please consult with a supervisor.

Our Company polices & guidelines support the COBC. Employees are expected to follow all Company policies and always behave ethically. Refer to the entire COBC for further details: COBC

## 1. GENERAL EXPECTATIONS

- Technicians are responsible for checking their work schedule or calling the supervisor to verify updates and changes. Technicians are required to abide by their work schedule and report at the start of their workday prepared to work.
- Dress in a professional manner and present a professional appearance. Practice good personal hygiene habits.



**AT&T Proprietary (Internal Use Only)**
Not for use or disclosure outside the AT&T companies except under written agreement

- If the customer requests additional work, the technician must accept the request provided it is within their scope to complete the work. Technicians must notify the supervisor if the additional work requested will interfere with their ability to take rest breaks or a meal period or require overtime (e.g., additional help, a second trip, additional set-top box, etc.).
- Technicians must notify their supervisor if they complete their work early, or if there is no additional work in the workload.
- Personal business will not be conducted during the technician's working time. This includes but is not limited to personal calls, text messages, etc. made or received during work time.
- Personal mail (e.g., bills, catalogues, personal correspondence, etc.) should not be sent to or received at Company locations or on Company equipment.
- Newspapers, magazines, books, other reading material and personal electronics not related to Company business must not be used while on work time. When these items are being used during breaks and meal periods in the Company vehicle or on Company premises, these items must be appropriate for the work environment since each technician is in a customer-facing position.
- Union-related business should not be conducted during work time.
- All technicians are responsible for knowing when they are supposed to work. All time worked must be reported thoroughly and accurately.
- Home-based technicians must comply with the applicable Guidelines.
- Incidental Overtime: Based on needs of the business it may be necessary to work incidental overtime to complete a current job and/or the rest of the load.
- Technicians must contact the supervisor when working any incidental overtime and all incidental overtime must be recorded for pay purposes. If a technician works overtime without approval, the technician will be paid for such time.
- Technicians assigned or who volunteer for overtime are expected to work the hours they are assigned or have volunteered to work.
- Employees who are scheduled as standby/on call are to be available for contact at all times on their Company Official Use (COU) device during the scheduled timeframe. Once contacted, employees are to dispatch out to the customer premise within one hour, or remotely access the site.
- Take a meal period within the allotted time period. If the technician uses a Company vehicle, the vehicle must remain within reasonable proximity to the technician's last job for Dynamically Dispatched jobs and the vehicle must



**AT&T Proprietary (Internal Use Only)**
Not for use or disclosure outside the AT&T companies except under written agreement

## DOCUMENTED COVERAGE

All Field Services Technicians are expected to follow these Expectations, as well as all Company policies. These Expectations are not intended to change, alter or supersede existing contractual provisions, OSHA requirements, safety requirements, Company policies, Company Code of Business Conduct (COBC) and applicable federal, state and local laws. These Expectations may be modified or interpreted by local management in a manner that is consistent with local practices and ensures compliance with federal, state and local laws.

These Expectations will be covered with all Field Services Technicians upon hire and annually. These Expectations are subject to change.

It is expected that every Field Services Technician will adhere to each of the Company's Code of Business Conduct, these Expectations, and Company policies at all times. Failure to do so may result in discipline, up to and including termination of employment.

This coverage will be documented and retained.

---

**Acknowledgment**

I have read these guidelines and agree to comply with them. I understand this coverage will be documented and retained within my online AT&T University Personal Learning Experience (PLE) training history. (NOTE: Failure to sign or acknowledge these Expectations will not excuse you from having to comply with them).

______________________________

Technician Name (Printed)

______________________________

Technician Signature

______________________________

Date

______________________________

Supervisor's Name (Printed)

______________________________

Supervisor's Signature



**AT&T Proprietary (Internal Use Only)**
Not for use or disclosure outside the AT&T companies except under written agreement

**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 4**

**Octo er 16, 2024 E ail fro Plaintiff to Mana e ent**

2:58 5G+

(no subject)

**You**
JZ1470@att.com

To: MAJORS, BYRON D bm5778@att.com
CHAPMAN, JODY jc4281@att.com
NEUF, AMANDA as9194@att.com

Cc: GIPSON, MONICA J mg7308@att.com

Wednesday, October 16, 2:57 PM

Good Afternoon Byron and management,

Due to stress and for my health, safety and well-being I will be returning to the way the I worked for this company for more than 7 years, with the exact same company field technician expectations and the same contract language pertaining to scheduling and overtime. If you any unexpected work hour changes or new overtime assignments, please inform me on a day-to-day basis.

Thank you,
Josue Zavala

Reply to All

Mail Calendar Feed Apps

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 5**

**Octo er 1 , 2024 E ail fro Plaintiff to Mana e ent**

(no subject)

You
JZ1470@att.com

To: MAJORS, BYRON D bm5778@att.com
CHAPMAN, JODY jc4281@att.com
NEUF, AMANDA as9194@att.com

Cc: GIPSON, MONICA J mg7308@att.com

Friday, October 18, 5:05 PM

Hello Byron and management,

According to the coaching meeting that I was in this morning I will not receive any daily notice of any unexpected additional hours I am expected to work. I was given a blanket directive to follow a manager created verbal directive instead as a term of employment. I am informing management that I believe this is an unsafe directive and creates a hostile work environment and is intended to take the place of provisions in the labor agreement.

Josue Zavala

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 6**

**AT&T Se aration Pro osal**

SEPARATION PROPOSAL

1. Employee name: Josue Zavala (jz1470)
2. Job title: Premises Technician
3. Work location: 3901 SW Loop 820 Fort Worth, TX 76133
4. Payroll company/business unit: AT&T Services / Customer Advocacy & Services
5. NCS date/date assigned to current position: 04/18/2014

6. Reason(s) for dismissal: Code of Business Conduct – Failure to follow AT&T Field Services Technician Expectations

7. Triggering event(s): Josue Zavala left prior to the all clear page on 10/18/2024 after a coaching discussion was held same day 10/18/2024 and after coming off Decision Making Leave and emailing management later that day informing company he will not be abiding by the coaching discussion. He also left prior to the all clear page on 10/21/2024 after an investigation meeting was held in reference to the leaving prior to the all clear page on 10/18/2024.

8. Policy or rule violated by employee (list all):

**AT&T Field Services Technician Expectations**

6. LOAD & TIME MANAGEMENT

• Incidental Overtime: Based on needs of the business it may be necessary to work incidental overtime to complete a current job and/or the rest of the load.
• Technicians must contact the supervisor when working any incidental overtime and all incidental overtime must be recorded for pay purposes. If a technician works overtime without approval, the technician will be paid for such time.
• Technicians assigned or who volunteer for overtime are expected to work the hours they are assigned or have volunteered to work.

9. Discussions/warnings (relating to triggering event or similar conduct):
   - COBC completed on 1/29/2024
   - AT&T Field Services Technician Expectations completed on 2/16/2024

10. Prior discipline (list all & reason for discipline):
    - 10/18/22 – Performance Notice – COBC - failure to follow AT&T Field Services Technician Expectations
    - 02/08/23 – Written Reminder – COBC - failure to follow AT&T Field Services Technician Expectations
    - 10/6/23 – DML – COBC - failure to follow management directive
    - Reiteration of DML 4/2/24 (Coaching Discussion)

11. Appraisal ratings (current performance & last three years, if available):
- 2023- does not meet
- 2022- does not meet

12. Suspension date (if applicable): 10/23/2024

---

13. Other information relevant to reason(s) for dismissal:

- Coaching Discussion 10/18/2024

Recommended: [signature] Date: 10/23/2024
Byron Majors, Manager - Network Services

Concurred:* [signature] Date: 10/29/2024
Jody Chapman, Assoc Director – Network Services

Approved: [signature] Date: 11/06/2024
Amanda Neuf, Director – Network Services

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT**

**Octo er 22, 2024 La or Relations Revie E ail C ain**

| | |
|---|---|
| **From:** | MADISON - AVILES, SHAUNTA <sb2159@att.com> |
| **Sent:** | Tuesday, October 22, 2024 1:37 PM CDT |
| **To:** | STEWART, GUY B (LABOR) <gs9183@att.com> |
| **CC:** | BRADLEY, ANDREW <ab3647@att.com> |
| **Subject:** | RE: Termination Review: Josue Zavala |

Thanks Guy. I also updated below that he is in a protected class based on race.

Shaunta

---

**From:** STEWART, GUY B (LABOR) <gs9183@att.com>
**Sent:** Tuesday, October 22, 2024 1:33 PM
**To:** MADISON - AVILES, SHAUNTA <sb2159@att.com>
**Cc:** BRADLEY, ANDREW <ab3647@att.com>
**Subject:** RE: Termination Review: Josue Zavala

Good afternoon Shaunta,

Labor will not stand in the way of the departments request to terminate this employee. It appears the progressive discipline did not work for this employee even after numerous discussions.

Nice write up for review.

Thank you,

***Guy Stewart***
***Lead Labor Relations***
***Southwest & Legacy T Labor Relations***
***817-682-3136***

AT&T Propriety (Internal Use Only)
Not for use or disclosure outside the AT&T companies except under written agreement. This email message and any files transmitted with it are the property of AT&T, are confidential, and are intended solely for the use of the individual or entity to whom this message was addressed. If you are not one of the named recipients or otherwise have reason to believe that you have received this message in error, please notify me at 817-682-3136 and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this email message is strictly prohibited.

---

**From:** MADISON - AVILES, SHAUNTA <sb2159@att.com>
**Sent:** Tuesday, October 22, 2024 12:28 PM
**To:** STEWART, GUY B (LABOR) <gs9183@att.com>
**Cc:** BRADLEY, ANDREW <ab3647@att.com>
**Subject:** Termination Review: Josue Zavala

Hello Guy,

Josue Zavala is currently not on COBC discipline.

Attached for your review is a recommendation from the client to terminate for Workplace Expectation.

NOTE: Employee is in a protected class based on race.

**Employee Name**: Josue Zavala
**ATTUID**: jz1470
**NCS**: 2014-04-18
**Title**: PREMISES TECHNICIAN
**Location:** Ft.Worth, TX

**Attachments:**

- Investigative Notes
- Discipline Notes for DML
- Coaching Notes
- SP

**Discipline History:**

- 10/18/22 – Performance Notice – COBC - failure to follow AT&T Field Services Technician Expectations
- 02/08/23 – Written Reminder – COBC - failure to follow AT&T Field Services Technician Expectations
- 10/6/23 – DML – COBC - failure to follow management directive

**Trigger:**

- On 10/8/2024, the employee left prior to the all clear page on 10/18/2024 after a coaching discussion was held same day. After coming off Decision Making Leave and emailing management later that day informing company he will not be abiding by the coaching discussion.

**Relevant Data:**

- Previous Union Steward Chief
- Employee has stated to management that he will not comply with the policy of dispatching till page goes out, even after being coached for this behavior
- HR supports Termination due to current incident occurring two days after the current DML expiring.

**Shaunta M.Aviles**
Lead Project Program Manager – Employee Relations
Human Resource – ATT Communications

**AT&T Services, Inc.**
208 S. Akard St, Dallas TX 75202
m 972.206.7952| sb2159@att.com

**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT**

**Decision Ma in Leave Doc entation**

# DECISION MAKING LEAVE

10-2-23

Dear Josue Zavala, Premise Technician

The following summarizes our discussions on 9-27-23, when you were placed on a Decision Making Leave (DML) and on 10-2-23, the day on which you returned to duty.

You were placed on a DML because you failed to follow a manager directive, which is a COBC violation. You were previously placed on a Performance Notice and a Written Reminder for violating COBC.

In order to retain your job, you must follow all the AT&T Field Services Technician Expectations going forward.

You stated that you wanted to continue your employment with the Company and were committed to meeting all job requirements. This means satisfactory performance in all components of work measurements, safety, and attendance/punctuality.

Your DML will remain active for a period of twelve months and will continue in effect until 9-27-24. It will be deactivated at that time providing you can follow all the AT&T Field Services Technician Expectations. I hope I will be able to meet with you next year at this time and provide you with another copy of this letter with the deactivation status noted.

I want to emphasize again, however, the extremely serious nature of this DML. Your job is in jeopardy and failure to follow all the AT&T Field Services Technician Expectations going forward could result in your dismissal.

This is not an admission of guilt. I do not believe I violated any company policies. JZ Byron Majors Refused to initial the modification.

Byron Majors, Manager Network Services [signature]

under fear of losing my Job, Duress and extortion

Josue Zavala, Premise Technician [signature]

***DML Deactivation Meeting: Josue Zavalla 10-18-24***

**Attendance:**

**Union:**

**Joshua Black (Note Taker)**

**Josue Zavala**

**Managers**

**William Snowden (Note Taker)**

**Byron Majors**

**Start: 8:37AM**

**End: 8:39AM**

Purpose of meeting: Deactivation of DML and Expectations moving forward:

Byron: Read the DML Letter to Mr. Zavala. Not following a managers Directive and COBC Violation. Today is the deactivation date 10/18/2024. You are expected to follow all guidelines of the Technician Guidelines do you have any questions and do you understand.

Zavala: No Sir

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT**

**Relevant Sections of t e AT&T So t est S ervisor's Man al**

4) completed a major project in a safe, cost-effective, and timely manner; or

5) achieved and maintained over a significant period of time one or more of the following:

a. an outstanding attendance record;

b. expected performance requirements; or

c. a spirit of teamwork and/or positive leadership demonstrated through specific action beyond normal duties and expectations.

B. Documentation for recognizing good performance ("positive contact") will be maintained by the supervisor using the Employee Discussion Log (Attachment A). Additional documentation may be maintained on the Employee Discussion Guide (Attachment B).

3.2 Employee discussion is the expected method for the supervisor to discuss work performance with the employee and is not part of the disciplinary process. The Performance Improvement Plan, Form SW-1096, (Attachment H) or a similar document should be used when a performance problem is identified. The objective of a performance discussion is to help the employee recognize a performance problem and develop effective solutions for it. Normally performance problems can be solved at this level. A Performance Improvement Plan is not a step of discipline. Documentation of employee discussions will be maintained by the supervisor using the Employee Discussion Log (Attachment A) and the Employee Discussion Guide (Attachment B).

3.3 Most performance improvement will be accomplished through recognition of good performance or employee discussions. The following procedures are devoted to the less frequent situations where a level of discipline is required. The levels of the Positive Discipline system are defined as follows and summarized in Attachment G.

A. Level One - Performance Notice

When an employee fails to respond to employee discussions or a single incident occurs which is serious enough to warrant a level of discipline, the supervisor has several options depending on the seriousness of the performance problem.

places a copy of the deactivation letter in the employee's personnel file.

Disciplinary documentation which has become inactive should be retained in the employee's personnel file, following the retention guidelines for documentation and discussion - five years or longer if necessary.

4.2 Recurrence of a Performance Problem After Deactivation. Occasionally, a problem may reoccur in a deactivated performance category. In some cases, the situation can be dealt with through an employee discussion. However, a manager is not required to start over at Step 1 if the situation is such that a more severe step of discipline, including dismissal, is appropriate.

All relevant factors, including the following, should be taken into account when determining which course of action to take:

A. seriousness of the performance problem;

B. length of time since deactivation;

C. chronic pattern of same or similar performance problems;

D. current active Performance Notices or Written Reminders; and

E. any mitigating or aggravating circumstances.

4.3 Deactivation Date. In certain situations it may be appropriate to extend the deactivation date when an employee has been away from the job for thirty consecutive calendar days or more and therefore has been unable to demonstrate improvement in the performance category. Examples include leaves of absence and Company training schools. Consideration may be given to adjusting the deactivation date by the amount of time away from the job.

No other adjustments (i.e. shortening or lengthening) shall be made to the deactivation date. A step of formal discipline is never deactivated early, even if the employee becomes satisfactory before the active period expires. A higher level of formal Positive Discipline may occur at any time during the active period. In this case, the new active period associated with the higher level begins.

**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 10**

**Relevant Provisions of t e CWA Constit tion and Internal A eals Proced res**

7. There shall be no right to appear personally before the Union Executive Board, except at the invitation of the Executive Board.

8. The decision of the Executive Board may be appealed to the next Convention or President's Meeting by giving notice of appeal in writing to the Secretary-Treasurer of the Union within 30 days after the decision. As provided more fully in Article IX, Section 7 of the CWA Constitution, commencing immediately after the 2011 CWA Convention, all appeals of Executive Board decisions pending in non-Convention years may be heard and resolved by delegates to a Local President's meeting to be called by CWA Secretary-Treasurer. If the Executive Board's decision is issued less than 30 days before the Convention or President's Meeting, the appellant shall have the option of filing an appeal prior to that President's Meeting or Convention or exercising the full 30 day appeal period and waiting until the next scheduled Convention or President's Meeting for a decision.

## III. Arbitration Complaints

In the event a Vice President determines not to arbitrate a grievance, either the Local or the grievant(s) may file a complaint.

In the event the Local does not file the initial arbitration complaint of a Vice President’s decision not to arbitrate a grievance, the Local’s right to file a complaint or to appeal at any level of the Internal Appeals Procedures shall be extinguished.

In cases where either the Local or the National Union settles a grievance, the grievant will have no further right to appeal pursuant to these appeals procedures.

*A. The Complaint*

1. A complaint of a Vice President’s decision not to arbitrate a grievance shall be:

(a) In writing;

(b) Signed by the complainant;

(c) Filed with the President of the Union; and

(d) Submitted within thirty (30) days of the notice of the Vice President’s decision.

*B. Consideration by the President of the complaint*

1. The President shall take whatever steps are deemed necessary to secure the facts of the matter complained about which may include an investigation and the obtaining of all records of the matter in the possession of the Vice President, the Local, its officers or governing body.

2. The President shall review the complaint and within thirty (30) days affirm, reverse or modify the decision of the Vice President, or return the case to the Vice President with such direction or order as may be determined to be appropriate. He or she shall notify interested parties of his or her action.

*C. Appeal of President's decision*

1. The decision of the President may be appealed in writing by the grievant(s), the Vice President or the Local, if otherwise appropriate, to the Executive Board of the Union within thirty (30) days following the date of the notice of the President's decision. The appeal shall be filed with the Secretary-Treasurer of the Union.

2. The Executive Board shall review the appeal and affirm, reverse or modify the decision of the President.

3. The Executive Board shall base its decision upon the record of the matter, including such statements as may be filed by the grievant(s), the Local, the Vice President or the President, and any other facts that may be developed.

4. There shall be no right to appear personally before the Union Executive Board, except at the invitation of the Executive Board.

5. Interested parties shall be notified in writing of the decision and action of the Executive Board.

6. The decision of the Executive Board on an appeal by a grievant shall be final and the grievant shall have no further right of appeal.

7. The decision of the Executive Board may be appealed by a Local or the Vice President, if otherwise appropriate to the next Convention or President's Meeting by giving notice of appeal in writing to the Secretary-Treasurer of the Union within 30 days after the decision. As provided more fully in Article IX, Section 7 of the CWA Constitution, commencing immediately after the 2011 CWA Convention, all appeals of Executive Board decisions pending in non-Convention years may be heard and resolved by delegates to a Local President's meeting to be called by CWA Secretary-Treasurer. If the Executive Board's decision is issued less than 30 days before the Convention or President's Meeting, the appellant shall have the option of filing an appeal prior to that President's Meeting or Convention or exercising the full 30-day appeal period and waiting until the next scheduled Convention or President's Meeting for a decision.

*Motion: Move that the appeals procedures as amended be adopted. Adopted: By the CWA Executive Board, April 19, 2012*

## NOTICE REGARDING UNION SECURITY AGREEMENTS AND AGENCY FEE OBJECTIONS

As a general matter, employees covered by a collective bargaining agreement containing a union security clause are required, as a condition of employment, to pay an agency fee equal to normal union dues (and, where applicable, initiation fees). While the wording of these clauses is not perfectly uniform, none requires more than the payment of this agency fee to retain employment.

The Communications Workers of America policy on agency fee objections is the Union's means of meeting its legal obligations to employees covered by union security clauses and of effectuating those employees' legal rights as stated in the applicable decisions of the United States Supreme Court (including Beck v. CWA) and

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 11**

**CWA Ar itration Revie Decisions, A eal Decisions, and Related Corres ondence**

Recommendation of CWA Representative Jose Lozano declining to recommend Plaintiff's grievance for arbitration.
Plaintiff's appeal of the recommendation not to recommend arbitration.
Decision of the CWA District 6 Vice President denying Plaintiff's appeal.
Decision of CWA President Claude Cummings denying Plaintiff's appeal.
Excerpts from Plaintiff's appeal to the CWA Executive Board, consisting of:
the introductory page;
the page stating Plaintiff's appeal of the President's decision; and
the signature page.
*rd r r d*
*r r r d r r d*
Certified Mail receipt documenting mailing of Plaintiff's Executive Board appeal.
USPS delivery confirmation showing delivery of Plaintiff's Executive Board appeal to CWA headquarters, including the delivery date and time.
USPS return receipt ("green card") confirming delivery of Plaintiff's Executive Board appeal.
Plaintiff's email requesting a status update regarding his pending Executive Board appeal after receiving no acknowledgment or decision.
Plaintiff's email asserting exhaustion of internal union remedies and requesting confirmation regarding any appeal by the Local Union or District.
Copy of Plaintiff's written exhaustion letter sent by mail.
USPS delivery confirmation for Plaintiff's exhaustion letter.

**Communications Workers of America, AFL-CIO**
District 6 Arkansas, Kansas, Missouri, Oklahoma, Texas

Dallas Staff Office
2300 Valley View Lane, Suite 700
Irving, TX 75062
Phone: 214-638-3255
Fax: 214-441-9399

September 11, 2025

Mr. Josue Zavala
1113 Churchill Rd
River Oaks, TX 76114

RE: Grievance D-022-24-ATTSW - Josue Zavala - Suspension/Termination
Ft. Worth, TX – AT&T Southwest - Local 6201

Dear Mr. Zavala:

On July 30, 2025, the Union held a meeting with the Company on the above-referenced grievance. Attached is a copy of the letter dated August 21, 2025 from Guy Stewart, Lead Labor Relations Manager, in which he denied the grievance.

The Local Officers and I made every attempt to convince the Company of the decision to terminate you was without just cause, but we were unable to prevail. The company argued that you failed to follow a directive by leaving before receiving a release page or approval from management. Based on the facts of your case, it is unlikely an arbitrator would rule in favor of the Union, since you had recently completed a DML step of discipline on 10/18/24 for not following a manager's directive. You then advised management, via email, you would revert back to leaving regardless of a release page, to which management called you into meeting to, once again, give you a directive to not leave before receiving a release page. You acknowledged not following the directive based on conflicting interpretation of the Labor Agreement language.

**Therefore, I have decided not to recommend this grievance for arbitration.**

Should you or the Local President wish to appeal my decision not to recommend arbitration of this matter, my office must receive a written, detailed statement of reasons for any such appeal, via USPS mail, no later than the close of business on **September 25, 2025** (14 days from the date of this letter) or you must follow the procedures set forth in the CWA Constitution, as amended. Please be advised that a copy is maintained in this office and will be made available for your review upon request.

If this office does not receive an appeal from you by **September 25, 2025**, this file will be closed.

Should you have any questions, please reach out.

Sincerely,

Jose Lozano
CWA Representative

JL:ct
opeiu#13

Attachment

C: Loren Williams, President - Local 6201

**To:** José Lozano, CWA Representative, CWA Dallas Staff Office

9/16/2025

Appeal of Decision Not to Arbitrate Grievance D-022-24-ATTSW

---

Dear Mr. Lozano,

I am writing to formally appeal your decision not to recommend my grievance for arbitration. Respectfully, I believe this decision overlooks critical admissions by the company and misstates the actual cause of my termination. These factors make my case far stronger than represented, and they clearly warrant arbitration.

## 1. The Company Admitted Appendix J Language Governs Our Work

During the grievance meeting, the company admitted that the "Change of Hours" language in Appendix J was "absorbed" when employees were merged into the work group, but claimed it was "never supposed to apply." This is a stunning admission:

- They acknowledged the language exists in the contract that governs my employment.
- Their defense is not that the language is irrelevant or inapplicable, but that they have unilaterally chosen to ignore it because of "intent."
- A signed Collective Bargaining Agreement is binding. "Intent" cannot erase or rewrite clear, executed language.

By enforcing their own "Technician Expectations" document in place of the CBA, the company openly admitted to a unilateral change in violation of NLRA § 8(a)(5). This is not just a contract dispute — it is a violation of federal labor law.

## 2. The Reason for My Termination Was Misstated

The union's letter frames this case as a failure to follow a directive. But the company's **Separation Proposal** makes clear that my termination was about "overtime" and the enforcement of their internal "Technician Expectations" document.

- Nowhere in the Separation Proposal does it state that I was terminated for failing to follow a directive.
- The alleged directive was simply the mechanism the company used to enforce its unlawful policy.
- The true issue is that I refused to comply with a non-contractual policy that their own document admits cannot override the CBA.

I consistently stated in every meeting that I was following all company policies and the CBA. To frame this solely as disobedience is inaccurate and disregards the contractual violations at the heart of this case.

### 3. The Union Acknowledged Conflicting Language — Which Demands Arbitration

Your letter stated that I "acknowledged not following the directive based on conflicting interpretation of the Labor Agreement language." This acknowledgement is crucial:

- It proves this is not a simple case of insubordination, but a genuine dispute over how the CBA applies.
- The very purpose of arbitration is to resolve **conflicting interpretations of contract language.**
- Denying arbitration because of conflicting interpretations undermines the grievance procedure itself and leaves the bargaining unit with no clarity or enforcement of our rights.

### 4. This Termination Was Retaliation for Protected Activity

My actions were not misconduct — they were the enforcement of the CBA. Terminating me for insisting the company follow the contract constitutes retaliation under NLRA § 8(a)(3). The prior DML discipline is for the same issue, which shows a pattern of retaliation for protected activity.

---

### Conclusion

The company has admitted the language of Appendix J governs my work, yet they refuse to follow it. They terminated me not for misconduct but for refusing to comply with an internal policy that cannot override the CBA. The union's own letter acknowledges this dispute is rooted in "conflicting interpretation," which is the precise reason arbitration exists.

This case does not just affect me. By refusing to arbitrate, the union is allowing the company to unilaterally erase and rewrite clear contractual protections for our entire bargaining unit. Arbitration is necessary to clarify and enforce our rights.

I respectfully urge you to reverse your decision and recommend this grievance for arbitration.

Sincerely,

[signature] 9-16-25

Josue Zavala Date

619-917-7416
1113 Churchill Rd.,
River Oaks, TX, 76114

Communications Workers of America, AFL-CIO
District 6 Arkansas, Kansas, Missouri, Oklahoma, Texas

**Derrick Osobase Sr.**
*Vice President*

**District 6 Headquarters**
Parkway at Oak Hill, Building One
4801 Southwest Parkway, Suite 145
Austin, Texas 78735
512-330-0871

January 2, 2026

Josue Zavala
1113 Churchill Rd.
River Oaks, Texas 76114

RE: 6-25-063 – Josue Zavala – Suspension/Termination
AT&T SW – Ft. Worth, Texas – Local 6201

Dear Mr. Zavala,

I am writing in response to your request for arbitration regarding your termination from AT&T, #6.25.063. Unfortunately, I do not believe we could convince an arbitrator that the Company's decision was a violation of the contract, and as a result we must deny your request.

We were provided the following information with regard to your termination: on October 16, 2024, you sent an email to the Company indicating that you would not follow the Company's policy and wait until the Company sent out the "release page" before ending your work day. As you phrased it in your email, you would be "returning to the way I worked for this company for more than 7 years." You further specified in your email that you disagreed with the Company's interpretation of the contract language regarding when field technicians' days should end. On the morning of October 18, Company officials met with you to reiterate Company policy that you should wait until the Company issued the release page before ending your workday. Later that day, you ended your work day before the Company sent out the release page. You did so again on October 21.

CWA regularly arbitrates matters of contract interpretation. An interpretation of the workday policy with regard to field technicians is one such matter that can be arbitrated. We have not considered that question here, however, because that is not the issue that is presented to us. Our consideration here is whether the Company violated the contract when it chose to terminate you for clearly and repeatedly violating a Company directive that you understood but disagreed with.

The correct process to resolve a dispute over contract language is to grieve the Company's interpretation of the contract language and to arbitrate that dispute, if necessary. By contrast, an arbitrator is very unlikely to find that each bargaining unit member may interpret the contract language themselves and, if they disagree with the Company's interpretation, simply disregard Company directives when they choose to do so without waiting to allow the contract interpretation question to be grieved/arbitrate per the contract.

Because we believe that an arbitrator would almost certainly find in favor of the Company, the Arbitration Review Panel must deny your request #6.25.063.

If you disagree with the Arbitration Review Panel's decision not to arbitrate this grievance, you may file an appeal under Section III of the Internal Appeals Procedures established under the

® ALLIED PRINTING AND MAILING AFL-CIO MEMBER 54

CWA Constitution. **Your appeal must be in writing, signed by you, and filed with the President of the Communications Workers of America within thirty (30) days of the date of this letter. The appeal may be submitted by mail or personal delivery. (E-mail appeals will not be processed.)** Your appeal must also contain any additional evidence you contend that the Union would be able to use to persuade an arbitrator to sustain your grievance. The CWA President's address is:

Claude Cummings, Jr., President
Communications Workers of America
501 Third Street, NW
Washington, DC 20001-2797

Sincerely,

Derrick Osobase, Sr.
Vice President

DO/nt
*opeiu#13*

c: Jose Lozano, CWA Representative
Loren Williams, President Local 6201

**Communications Workers of America**
AFL-CIO, CLC
501 Third Street, N.W.
Washington, D.C. 20001-2797
202/434-1110 Fax: 202/434-1139
**Claude Cummings Jr.**
President

***Sent via E-mail:***

March 16, 2026

Josue Zavala
Jzavala.cwa@gmail.com
1113 Churchill Rd.
River Oaks, TX 76114

Re: Grievance no. 6-25-063 – Josue Zavala – Termination, AT&T Southwest – Fort Worth, Texas – Local 6201

Dear Member Zavala:

On February 11, 2026, I docketed your timely appeal of the District 6 Arbitration Review Panel's decision declining to arbitrate the above-referenced grievance. For the following reasons, I uphold District 6's Arbitration Review Panel's decision and therefore deny your appeal.

The District file shows that on November 1, 2024, AT&T Southwest ("the Company") terminated your employment for refusing to comply with a supervisor's directive.

On October 16, 2024, you emailed Byron Majors and managers stating that:

> Due to stress and for my health, safety and well-being I will be returning to the way [that] I worked for this company for more than 7 years, with the exact same company field technician expectations and the same contract language pertaining to scheduling and overtime. If you [have] any unexpected work hour changes or new overtime assignments, please inform me on a day-to-day basis.

Two days later, you had a "coaching meeting" with managers. During the "coaching meeting," managers explained that you were to wait for a "release page" before ending work. After the "coaching meeting," you emailed managers and stated that "[a]ccording to the coaching meeting that I was in this morning I will not receive any daily notice of any unexpected additional hours I am expected to work." You then stated your belief that the directive you received from managers at the meeting was in violation of the collective bargaining agreement ("CBA"). Despite managers' instruction to wait until you receive a

release page before ending work, you left work before receiving one that day and again on October 21, 2024. As a result, the Company terminated your employment for willfully violating the Company's Field Services Technician Expectations.

To summarize the arguments in your appeal, you argue that your manager's directive to perform work duties until you received a release page was a violation of the CBA and therefore the decision to terminate your employment lacked just cause. You also contend that the directive constituted a unilateral change in terms and conditions of employment and constituted an unfair labor practice under section 8(a)(5) of the National Labor Relations Act ("NLRA"). Finally, you argue that by challenging the Company's instruction on October 18, 2024, you were engaged in protected concerted activity and as a result your termination was a violation of section 8(a)(3) of the NLRA.

When determining whether a grievance should proceed to arbitration, the most important factor to consider is whether we could persuade an Arbitrator that your discipline was not for just cause. A common defense when an employer alleges insubordination is that the order issued by a supervisor was unreasonable. To validly invoke this defense, many Arbitrators analyze whether the rule or order was reasonably related to a legitimate business objective. When a rule or order is reasonably related to a legitimate business objective, and there are no overriding justifications, such as placing the grievant in physical danger or clearly violating the law, Arbitrators will regularly dismiss grievances and uphold an employer's discipline.

Here, an Arbitrator will likely determine that you were insubordinate for refusing to follow your supervisor's instruction to only leave work after receiving a release page. Insubordination is commonly defined as a willful refusal to follow a reasonable order from a supervisor or manager. To that end, you were instructed on October 18, 2024, not to end work until you received a release page. Your follow-up email to managers shortly after the "coaching meeting" shows that you understood the instruction but disagreed with it. Thus, an Arbitrator is likely to find that you willfully refused to follow a directive from your supervisor when you ended work before receiving the release page on October 18, 2024, and October 21, 2024.
The next question is whether you have a valid defense for engaging in otherwise insubordinate conduct. Here, your defenses are unlikely to prevail before an Arbitrator. Under Appendix J, Section 3. Overtime, the CBA states:

> Employees may be required to work overtime subject to the needs of the business. Employees scheduled to work overtime will be paid in

> accordance with applicable Federal and/or State Laws. Employees will not be scheduled or assigned overtime in excess of 14 hours in a work week unless either the employee consents to such overtime assignment or, as determined by management, there exists a service emergency . . ..

Although it is unclear whether the hours you worked during the week of October 18, 2024, exceeded forty hours, there is no evidence that you exceeded the CBA's 14-hour overtime cap. Additionally, you concede that during the week of October 21, 2024, you did not accrue forty hours. Because there is no evidence of you exceeding the 14-hour overtime cap for the week of October 18th you did not accrue forty hours for the work week of October 21st, an Arbitrator will likely determine that the Company did not violate the CBA when you were instructed to work beyond your normally scheduled workday.

Importantly, neither the Work Schedules nor the Change of Hours provisions contained in Appendix J give employees the right to refuse supervisor instructions. Because there is no evidence that the Overtime provision was violated and the other contractual provisions do not permit employees to refuse supervisor orders or instructions, an Arbitrator will likely rule against the grievance. For the same reasons, an Arbitrator is unlikely to find a unilateral change in violation of Section 8(a)(5).

Similarly, an Arbitrator will likely determine that the Company did not discriminate against you for engaging in protected concerted activity. Under the National Labor Relations Board's ("NLRB") test for violations of section 8(a)(3) of the NLRA, the prosecuting party must prove that (1) the employee engaged in union or other protected activity, (2) the employer knew about that activity, and (3) the adverse employment action was motivated by animus on the part of the employer. Once the prosecuting party proves a prima facie case, the company may invoke the "same decision" defense. Under the "same decision" defense, the Company must show that it would have made the same decision to impose an adverse employment action in the absence of protected activity.
Because there is no evidence of animus against your protected concerted activity, we are unlikely to succeed in proving a prima facie case of discrimination. Here, your claim that there was a unilateral change is nothing more than a breach of contract claim, which under the parties CBA must be resolved through the grievance process. An alleged breach of a contractual provision where the parties reached an agreement does not constitute a unilateral change. Thus, we are unlikely to persuade an Arbitrator that the Company engaged in unlawful discrimination or a unilateral change under the NLRA.

Because an Arbitrator would likely determine that you willfully refused to comply with a reasonable order from your supervisors, and there are no countervailing facts demonstrating that the Company was prohibited from directing you to continue working until you received a release page, we are unlikely to persuade an Arbitrator that the Company lacked just cause when it terminated your employment. Therefore, I must agree with the District 6 Arbitration Review Panel's decision and deny your appeal.

As provided in Section III.C of the CWA Internal Appeals Procedures, you have the right to appeal this decision to the CWA Executive Board by filing an appeal with CWA Secretary-Treasurer Ameenah Salaam in writing within 30 days of the date of this letter. Secretary-Treasurer Salaam's address is: 501 Third Street NW, Washington, D.C. 20001.

Sincerely,

Claude Cummings Jr.
President

cc: Derrick Osobase, Vice President, CWA District 6
Billy Moffet, Assistant to District 6 Vice President
Michael Cowles, District 6 Counsel
Jose Lozano, Staff Representative
Loren Williams, Local 6201 President

Josue Zavala
1113 Churchill Rd,
River Oaks, TX, 76114
JZavala.cwa@gmail.com

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
**TRACKING # 9589 0710 5270 3478 8985 03**

CWA Secretary Treasurer Ameenah Salaam
501 Third Street NW,
Washington, D.C. 20001

**DATE:** 3/18/2026

**RE: Josue Zavala – Appeal of Grievance No. 6-25-063 (Termination, AT&T Southwest – Local 6201)**

## INTRODUCTION

This appeal is not complicated. The Union's denial letter got the basic facts wrong. The Company violated its own policies at every step. When you see the actual timeline and the actual rules, there is only one conclusion: **My termination was not for just cause.**

I am going to walk you through this slowly. Each section has a heading. Each fact has a date. Each rule has a page number. You cannot miss it.

---

## A Note to the Executive Board

I respectfully request that the Executive Board read my original appeal to the Union President, dated March 16, 2026, as part of this filing. That document contains **numerous arguments and evidentiary points that are not repeated here** for the sake of brevity and readability.

I have chosen not to restate every argument from that extensive page submission in this appeal. Adding that volume of paper would bog down the reader and obscure the core issues. However, **those arguments and facts are essential context** for understanding the full scope of the Company's misconduct and the Union's failures.

The original appeal includes, but is not limited to:

16. **The Union's Failure to Investigate:** My argument that the Union failed its most basic duty by not investigating the core factual discrepancies (like the CA/TX disparity or the unequal application to other job titles) was not mentioned.
17. **Systemic Evasion of Contractual Penalty Pay:** My detailed argument that the "release page" policy is designed specifically to avoid triggering the "Change of Hours" penalty pay (2 hours of straight time) mandated by Appendix J, Section 3.2, was ignored.

The Union's failure to address key arguments from my appeal was not accidental—it was intentional. These arguments are essential to understanding the full scope of the Company's violations, and by ignoring them, the Union has made itself complicit in the Company's daily breach of contract.

**RELIEF REQUESTED**

I hereby formally appeal the decision of the CWA President Claude Cummings Jr. dated March 16, 2026, which arbitrarily and in bad faith refused to advance my grievance to arbitration. Based on the overwhelming evidence that the Company violated its own policies at every turn—using coaching discussions as discipline, denying me my fresh start after my DML expired, ignoring the five factors in Section 4.2, illegally extending my DML by 21 days, fabricating a fake "Reiteration" disciplinary step, filing a defective Separation Proposal, and failing every Test of Just Cause—while also engaging in a unilateral change to the Collective Bargaining Agreement and unlawful retaliation for protected activity, and based on the Union's breach of its duty of fair representation, I request that the CWA Executive Board:

1. Immediately reverse the President's denial and direct that my grievance be submitted to arbitration without further delay.
2. Instruct the Union's bargaining representative to pursue the following full and complete settlement from AT&T, either through arbitration or a negotiated resolution:

## A. REINSTATEMENT

Immediate, unconditional reinstatement to my former position as Premises Technician at the Fort Worth location (3901 SW Loop 820, Fort Worth, TX 76133), with no loss of seniority or benefits. The complete removal from my personnel file of all disciplinary records (including the termination, the Decision Making Leave, Written Reminder, and Performance Notice) stemming from my protected challenge to the unlawful "release page" policy.

evidence that could clear my name. They chose not to look. They chose not to investigate. They chose not to fight.

I gave them over 90 pages of evidence. They gave me back 4 pages of excuses. That is not representation. That is dereliction of duty.

## The Arbitration Would Be Won on These Facts Alone

The Union's denial letter spent a lot of time telling me what an arbitrator might think. But here is what I know: An arbitrator would have done more for me than my own Union did.

An arbitrator would have asked why. An arbitrator would have read the policies. An arbitrator would have compared the Company's actions to their own manual. An arbitrator would have considered my health and safety concerns. An arbitrator would have noticed the DML was illegally extended. An arbitrator would have seen the fake "Reiteration" for what it is: a fabrication. An arbitrator would have asked to see the agreement the Union claims exists. An arbitrator would have demanded the notes from the fifth-level grievance meeting. An arbitrator would have done what the Union refused to do: investigate.

The Union had one job: to be that advocate before it got to arbitration. They failed. Now I am asking you to do what they would not.

**Respectfully submitted,**

[signature] 3/18/2026

Josue Zavala
1113 Churchill Rd,
River Oaks, TX, 76114
JZavala.cwa@gmail.com

9589 0710 5270 3478 8985 03

# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com*®.

Washington, DC 20001

OFFICIAL USE

| | |
|---|---|
| Certified Mail Fee $ $5.30 | 0114 |
| $4.40 | 35 |
| Extra Services & Fees *(check box, add fee as appropriate)* | |
| ☐ Return Receipt (hardcopy) $ $0.00 | |
| ☐ Return Receipt (electronic) $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery $ $0.00 | |
| ☐ Adult Signature Required $ $0.00 | |
| ☐ Adult Signature Restricted Delivery $ | |
| Postage $ $16.80 | 03/19/2026 |
| **Total Postage and Fees** $ $26.50 | |

*Sent To* TERM Appl to EXEC Bord

*Street and Apt. No., or PO Box No.*

*City, State, ZIP+4®*

**PS Form 3800, January 2023** PSN 7530-02-000-9047 **See Reverse for Instructions**

UNITED STATES POSTAL SERVICE.

OAKS
1008 ROBERTS CUT OFF RD
RIVER OAKS, TX 76114-9998
www.usps.com

03/19/2026 11:50 AM

TRACKING NUMBERS
9589 0710 5270 3478 8985 03

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| Mailer 10.5 x 16 | 1 | $1.89 | $1.89 |
| Priority Mail® | 1 | | $16.80 |
| Washington, DC 20001 | | | |
| Weight: 1 lb 14.10 oz | | | |
| Expected Delivery Date | | | |
| Mon 03/23/2026 | | | |
| Insurance | | | |
| Up to $100.00 included | | | $0.00 |
| Certified Mail® | | | $5.30 |
| Tracking #: | | | |
| 9589 0710 5270 3478 8985 03 | | | |
| Return Receipt | | | $4.40 |
| Tracking #: | | | |
| 9590 9402 9732 5199 9615 55 | | | |
| Total | | | $26.50 |

Grand Total: $28.39

Debit Card Remit $28.39
Card Name: MasterCard
Account #: XXXXXXXXXXXX0415
Approval #: 125309
Transaction #: 184
Receipt #: 058397
Debit Card Purchase: $28.39
AID: A0000000042203 Contactless
AL: US Debit

TO REPORT AN ISSUE
Visit https://emailus.usps.com

All hazardous labels/markings on reused boxes MUST be completely removed/obliterated if they no longer match the contents.

TO FILE AN INSURANCE CLAIM
Visit https://www.usps.com/...

ALERT: IMPACTS FROM THE WORLD SOCCER TOURNAMENT HELD IN MAJOR CITIES THROU...

# USPS Tracking®

FAQs >

Tracking Number:

Remove ✕

**9589071052703478898503**

Copy Add to Informed Delivery

## Latest Update

Your item was delivered to the front desk, reception area, or mail room at 1:04 pm on March 25, 2026 in WASHINGTON, DC 20001.

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

Feedback

## Delivered

**Delivered, Front Desk/Reception/Mail Room**

WASHINGTON, DC 20001
March 25, 2026 1:04 PM

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?**

**Text & Email Updates**

**USPS Tracking Plus®**

**Product Information**

**See Less**

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CWA Secretary-Treasurer
Ameenah Saleem
501 3rd street NW,
Washington, D.C., 20001

9590 9402 9732 5199 9615 55

2. Article Number (*Transfer from service label*)

9589 0710 5270 3478 8985 03

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (*Printed Name*)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type

☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053 Domestic Return Receipt

USPS TRACKING#

CAPITAL DISTRICT 208

25 MAR 2026 PM 4 L

9590 9402 9732 5199 9615 55

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Josue Zavck
1113 Churchill Rd.
River Oaks, TX, 76114

4-272113

Gmail

Josue Zavala <jzavala.cwa@gmail.com>

## NOTICE: Executive Board Appeal Filed – Grievance #6-25-063 (Zavala) – 30-Day Deadline

1 message

**Josue Zavala** <jzavala.cwa@gmail.com> Mon, Mar 30, 2026 at 2:06 PM
To: Ethel Pierce <epierce@cwa-union.org>, asalaam@cwa-union.org
Cc: Derrick Osobase <dosobase@cwa-union.org>, Billy Moffett <bmoffett@cwa-union.org>, Michael Cowles <mcowles@cwa-union.org>, Jose Lozano <jlozano@cwa-union.org>, cwa6201pres@gmail.com, Matthew Holder <mholder@cwa-union.org>, Elliott Becker <ebecker@cwa-union.org>, Colin Wescott <cwescott@cwa-union.org>, Ethel Pierce <epierce@cwa-union.org>, Nneka Maceo <nmaceo@cwa-union.org>, Nicole Tupa <NTupa@cwa-union.org>, Kelly Aiken <kaiken@cwa-union.org>, Simon Cao <scao@cwa-union.org>, Claude Cummings <ccummings@cwa-union.org>
Bcc: Josue Zavala <jzavala.cwa@gmail.com>, J Z <jdzvsg@yahoo.com>

Dear Ethel Pierce and Secretary-Treasurer Ameenah Salaam,

I am writing to confirm that my Executive Board appeal regarding Grievance #6-25-063 was timely filed and received by CWA Headquarters, and to place on the record the constitutional deadline for response.

**Filing Details:**

| Document | Tracking # | Received Date |
|---|---|---|
| Executive Board Appeal (Grievance #6-25-063) | 9589 0710 5270 3478 8985 03 | **March 25, 2026** |

The appeal was sent via Certified Mail, Return Receipt Requested. USPS tracking confirms delivery to the front desk/reception area at CWA Headquarters on **March 25, 2026 at 1:04 PM**.

**Constitutional Deadline:**

Under the CWA Constitution (Section III, C), the Executive Board has **30 days** from the date of receipt to issue a decision on an appeal.

- Date received: **March 25, 2026**
- 30-day deadline: **Friday, April 24, 2026**

**Status Request:**

To date, I have received no acknowledgment of this filing and no communication regarding the status of my appeal. Please confirm:

1. That my Executive Board appeal (Grievance #6-25-063) has been received and docketed;
2. That it has been forwarded to the Executive Board for review; and
3. That my supplemental filings in the related matter (Grievance #6-25-035) remain part of the record.

If I do not receive a decision by the constitutional deadline of **April 24, 2026**, I will consider my appeal denied by operation of the Executive Board's failure to act and will treat all internal remedies as exhausted.

Please confirm receipt of this email and advise on the status of my appeal.

Respectfully,

Josue Zavala
1113 Churchill Rd.
River Oaks, TX 76114
619-917-7416
JZavala.cwa@gmail.com

Gmail Josue Zavala <jzavala.cwa@gmail.com>

## FINAL NOTICE: Executive Board Appeal Deemed Denied – Grievance #6-25-063 (Zavala)

**Josue Zavala** <jzavala.cwa@gmail.com> Wed, May 27, 2026 at 10:45 PM
To: asalaam@cwa-union.org, Ethel Pierce <epierce@cwa-union.org>
Cc: Derrick Osobase <dosobase@cwa-union.org>, Billy Moffett <bmoffett@cwa-union.org>, Michael Cowles <mcowles@cwa-union.org>, Jose Lozano <jlozano@cwa-union.org>, cwa6201pres@gmail.com, Matthew Holder <mholder@cwa-union.org>, Elliott Becker <ebecker@cwa-union.org>, Colin Wescott <cwescott@cwa-union.org>, Ethel Pierce <epierce@cwa-union.org>, Nneka Maceo <nmaceo@cwa-union.org>, Nicole Tupa <NTupa@cwa-union.org>, Kelly Aiken <kaiken@cwa-union.org>, Simon Cao <scao@cwa-union.org>, Claude Cummings <ccummings@cwa-union.org>
Bcc: Josue Zavala <jzavala.cwa@gmail.com>

Dear Secretary-Treasurer Salaam,

**Re: Grievance #6-25-063 (Josue Zavala) – Termination**

Pursuant to CWA Constitution Article III, Section C, Paragraph 7, the deadline for the Local or the Vice President to file a notice of appeal to the Convention regarding the Executive Board's deemed denial dated April 24, 2026, has now passed.

For the sole purpose of accurately determining the finality of **my own** internal remedies for external filing obligations, please confirm the following:

1. Whether the Local or the Vice President filed a notice of appeal to the Convention concerning the Executive Board's deemed denial dated April 24, 2026, in the matter of Grievance #6-25-063 (Josue Zavala).
2. If such an appeal was filed, please provide only the **date** on which it was filed.

I am not requesting a copy of the appeal, any substantive information about its contents, or any participation in that process. The Constitution provides me with no further right of appeal or involvement. This inquiry is limited strictly to confirming whether an appeal exists and its filing date.

**Response Requested By: June 11, 2026**

If I do not receive a response by this date, I will reasonably conclude that no such appeal was filed and that the internal union process is fully concluded as to my individual rights.

A hard copy of this correspondence is being sent via U.S. Certified Mail, Return Receipt Requested.

Respectfully,

Josue Zavala
jzavala.cwa@gmail.com
1113 Churchill Rd.
River Oaks, TX 76114
619-917-7416

**2026-05-27_Zavala_CWA_Exhaustion_Inquiry_Grievance_6-25-063.pdf.pdf**
686K

**Date:** May 27, 2026

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**
**Tracking Number: 9589 0710 5270 3478 8985 34**

To:
Ameenah Salaam, Secretary-Treasurer
Communications Workers of America
501 3rd Street NW
Washington, DC 20001

**Re: Grievance #6-25-063 (Josue Zavala) – Termination – Exhaustion of Internal Remedies**

Dear Secretary-Treasurer Salaam,

Pursuant to CWA Constitution Article III, Section C, Paragraph 7, the deadline for the Local or the Vice President to file a notice of appeal to the Convention regarding the Executive Board's deemed denial dated April 24, 2026, has now passed.

For the sole purpose of accurately determining the finality of **my own** internal remedies for external filing obligations, please confirm the following:

1. Whether the Local or the Vice President filed a notice of appeal to the Convention concerning the Executive Board's deemed denial dated April 24, 2026, in the matter of Grievance #6-25-063 (Josue Zavala).
2. If such an appeal was filed, please provide only the **date** on which it was filed.

I am not requesting a copy of the appeal, any substantive information about its contents, or any participation in that process. The Constitution provides me with no further right of appeal or involvement. This inquiry is limited strictly to confirming whether an appeal exists and its filing date.

**Response Requested By: June 11, 2026**

If I do not receive a response by this date, I will reasonably conclude that no such appeal was filed and that the internal union process is fully concluded as to my individual rights.

A courtesy copy of this correspondence has been sent via email.
Respectfully,

[signature] 5-27-2026

Josue Zavala
1113 Churchill Rd.
River Oaks, TX 76114
619-917-7416
jzavala.cwa@gmail.com

ALERT: IMPACTS FROM THE WORLD SOCCER TOURNAMENT HELD IN MAJOR CITIES THROU...

# USPS Tracking®

FAQs >

Remove ✕

Tracking Number:

## 9589071052703478898534

Copy Add to Informed Delivery

### Latest Update

Your item was delivered to an individual at the address at 5:22 pm on June 1, 2026 in WASHINGTON, DC 20001.

Get More Out of USPS Tracking:

USPS Tracking Plus®

### Delivered

**Delivered, Left with Individual**

WASHINGTON, DC 20001
June 1, 2026 5:22 PM

See All Tracking History

What Do USPS Tracking Statuses Mean?

Feedback

Text & Email Updates

USPS Tracking Plus®

Product Information

See Less

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**

**Communications**
**Workers of America**
AFL-CIO, CLC

501 Third Street, N.W.
Washington, D.C. 20001-2797
202/434-1321 Fax: 202/434-1481

**Ameenah Salaam**
Secretary-Treasurer

***Sent via E-mail:***

July 20, 2026

Josue Zavala
Jzavala.cwa@gmail.com
1113 Churchill Road
River Oaks, TX 76114

Re: Grievance No. 6-25-063 – Termination – AT&T Southwest – Local 6201

Dear Member Zavala:

This letter will advise you that on the CWA Executive Board has considered your appeal after which they adopted the following motion:

**MOTION:** Move that Josue Zavala's appeal be denied and uphold President Cummings and the District 6 Arbitration Review Panel's decision.

You have now exhausted your Internal Appeals Procedures, and there is no further action to be taken.

Sincerely,

Ameenah Salaam

Ameenah Salaam
Secretary-Treasurer

cc: Derrick Osobase
Billy Moffett
Michael Cowles
Jose Lozano
Loren Williams, Local 6201, President

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 12**

**Marc 20, 2023 Res onse to CWA Re est for Infor ation No. 110163 Sc ed led vs. Assi ned Overti e**

at&t
AT&T Field Operations-SW
115 W Adams Ave., 1-B-06
Kirkwood, MO 63122
T: 314-288-3855
F: 855-288-0127

March 20, 2023

Tommy White, President
CWA Local 6201
421 South Adams
Fort Worth, TX 76104-1072

Re: CWA Request for Information – Josue Zavala-WR

Dear Mr. White:

The following information is provided in response to your letter dated March 3, 2023:

1. Written Reminder-**provided**
2. Copy of any investigation conducted by or for the Company-**request is vague, please clarify investigation of what**
3. A copy of assigned overtime in Appendix J-**please refer to CWA 2017 Labor Agreement, page 184-section 3. Overtime**
4. Difference between scheduled and assigned overtime in Appendix J- **Scheduled – foreseen overtime i.e. 6 day, Assigned – incidental unforeseen overtime**
5. Process for establishing the need to assign overtime in Appendix J- **based on needs of the business, Premise Technicians are expected to work until the load is clear**
6. Process for establishing the need to assign overtime in Appendix J- **dupe of #5**
7. Process for assigning overtime hours in Appendix J- **based on needs of the business, Premise Technicians are expected to work until the load is clear**
8.

If you have any questions, please feel free to contact me at 816-944-8624 to discuss.

Sincerely,

Nicole M. Smith

Nicole M. Smith
HR Employee Relations Manager II

NS/ch

CWA Grievance #:002.23
22-J126998
RFI #: 110163

**AT&T Proprietary (Internal Use Only)**
Not for use or disclosure outside the AT&T companies
except under written agreement

**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 13**

**Marc 23, 2022 Coac in Disc ssion Release Pa e Incidental Overti e**

# Coaching Discussion

CONTACT TYPE
In Person  Phone/Remote

STATUS
✓

| First Name | Last Name | UID |
|---|---|---|
| JOSUE | ZAVALA | jz1470 |

| Job Title | Department | Supervisor Name & Title |
|---|---|---|
| PREMISES TECHNICIAN | CUSTOMER ADVOCACY & SERVICE | ALVIN ADAIR<br>MANAGER NETWORK SERVICES |

| Discussion Date | Select Category |
|---|---|
| 03/23/22 | Other,Policy |

Topics Discussed
Incidental/Forced Overtime

Comments

Today we had a coaching discussion about covering the load after hours causing incidental overtime. We notified you that due to needs of the business you may incur incidental/forced overtime to cover the load and that we are not sure when the load is covered until we receive a release from your direct supervisor or the duty manager after 5:00 pm. You agreed from this day forward that you would not return to work center without receiving a release via text or phone call.

Add above comments to these draft Docs:

Import Comments
##

| DATE | FORM | COMMENTS |
|---|---|---|

## Attachments

No Attachments

Completed by:

ALVIN ADAIR

Date/Time 03/23/2022 05.50 PM

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**EXHIBIT 14**

**Defendant's Res onse to Re est for Infor ation No. 1101 5, Res onse No. 6 EXTS C an e-of-Ho rs Co ensation**

For Josh:



at&t

AT&T Field Operations-SW
115 W Adams Ave., 1-B-06
Kirkwood, MO 63122

T: 314-288-3855
F: 855-288-0127

May 1, 2023

Tommy White, President
CWA Local 6201
421 South Adams
Fort Worth, TX 76104-1072

Re: CWA Request for Information – Josue Zavala-PN

Dear Mr. White:

The following information is provided in response to your letter dated April 3, 2023:

1. Did I fail to follow any OP45 attendance policies by only working my scheduled sessions that day? – (OP45 not violated, violated Technician Expectations please refer to copy of Performance Notice)
2. I am requesting all District 6 Bargaining notes from the Company during bargaining Appendix J Labor Agreement contract. – (The Company objects to this request as vague, ambiguous, overly broad and unduly burdensome. In addition, your request seeks confidential business records and/or confidential information relating to the bargaining process. Subject to these objections and without waiver of the same, District 6 should have records relevant to your request and we would point you there.)
3. Full Names and Job titles of those who were bargaining for District 6 Appendix J Labor Agreement contract. – (The Company objects to this request as vague, ambiguous, overly broad and unduly burdensome. Subject to these objections and without waiver of the same, District 6 should have records relevant to your request and we would point you there.)
4. How much time the Company determined Premise Technicians should complete a repair ticket. – (repair ticket time is 0.96 of 1 hour)
5. How much time is needed to be at the yard (garage) to prepare Premises Technicians shift? – (refer to Tech Expectations pg 14, first 2 bullet points)
6. How many Appendix J employees were paid the payment code EXTS in the past 12 months in District 6 and District 9 and for what reason the change of hours straight time pay protection clause was paid out for. (No EXTS hours reported in FTW Area. See report provided. The Company objects to this request as vague, ambiguous, overly broad and unduly burdensome for providing all of District 6 and District)
7. On October 18, 2022, the day of the reported incident that led to a PN, at what time was the last job completed and who was the technician who completed the last job that day and please include the names and hours worked for all employees working that day in Fort Worth west turf. – (last job completed was by Michael Stinson, refer report pulled provided)

**AT&T Proprietary (Internal Use Only)**
Not for use or disclosure outside the AT&T companies
except under written agreement

at&t

8. In an employee may be required to work overtime and if an employee may be required to work incidental overtime, is management required to inform employees of the new requirement to work overtime or incidental overtime. If so, how is management supposed to make employees aware of the new requirement. – (The Company objects to this request as vague, ambiguous, overly broad and unduly burdensome. In addition, your request revolves around and relates to business operations and business decisions.)
9. Full names and job titles of the employees or employee who created the incidental overtime expectation. – (The Company objects to this request as vague, ambiguous, overly broad and unduly burdensome. In addition, your request revolves around and relates to business operations and business decisions.)

If you have any questions, please feel free to contact me at 816-944-8624 to discuss.

Sincerely,

Nicole M. Smith

Nicole M. Smith
HR Employee Relations Manager II

NS/ch

CWA Grievance #:067.23
22-J127076
RFI #: 110185

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 15**

**A ril 11, 2025 "Intent to Ar itrate" Letter Derric Oso ase to AT&T**

**Communications Workers of America**, AFL-CIO
**District 6** Arkansas, Kansas, Missouri, Oklahoma, Texas

**Derrick Osobase Sr.**
*Vice President*

**District 6 Headquarters**
Parkway at Oak Hill, Building One
4801 Southwest Parkway, Suite 145
Austin, Texas 78735
512-330-0871
fax: 512-330-0886

April 11, 2025

Randy White
VP West/Midwest Labor Relations
95 W Algonquin Rd.
Arlington Heights, IL 60005

Re: Intent to Arbitrate
CWA 6-25-035 – Josue Zavala – DML
Ft. Worth, Texas – Local 6201

Dear Mr. White:

This is to notify you of the Union's intent to arbitrate the Company's action in placing Mr. Josue Zavala on a DML on or about September 27, 2023. The Union contends this action to be without just cause.

The issue to be arbitrated is: Did the company place Mr. Josue Zavala on a DML on or about September 27, 2023? The Union contends this action to be without just cause. If so, what shall the remedy be?

The Union seeks a decision from the Arbitrator that the Company did, in fact, place Mr. Josue Zavala on a DML on or about September 27, 2023. The Union contends this action to be without just cause.

The Union also requests that the grievant(s) be accorded the treatment requested and compensated financially or otherwise for any losses incurred.

The Union further requests that the Company stop the clock on this case.

May we suggest a meeting at your earliest convenience to select an arbitrator.

Sincerely,

Derrick Osobase, Sr.
Vice President

DO/nt
*opeiu#13*

c: Jose Lozano, CWA Representative
Loren Williams, President Local 6201

54
ALLIED PRINTING AND MAILING AFL-CIO MEMBER

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 16**

**J l 14, 2025 E ail fro Jose Lo ano to Jos e Zavala**

Gmail

Josue Zavala <jzavala.cwa@gmail.com>

---

**Fwd: 6-25-035 Josue Zavala - Letter of intent/stop the clock**

---

**Jose Lozano** <jlozano@cwa-union.org> Mon, Jul 14, 2025 at 2:19 PM
To: jzavala.cwa@gmail.com

Dear Mr. Zavala,

I'd like to respond to your questions in your email dated July 6, 2025, and provide some additional information.

The letter I previously sent to you (April 10), confirmed by the mailing address you provided below, informed you that the company had denied your grievance and that I had appealed to the Arbitration Review Board (ARB). I previously emailed the letter that CWA sent to AT&T on April 11, 2025, notifying them of the union's intention to arbitrate the company's decision to place you on a DML.

I understand your questions about the process. You asked about the arbitration, and here's what I can clarify:

1. Your grievance was recommended for arbitration because I believe the company's action of placing you on the DML was without just cause.

2. Before a case goes before an arbitrator, our CWA Arbitration Review Board reviews it. The board will consider all the documents on file and make the final determination as to whether the case should be arbitrated.

3. All the documents that were sent by the District office to AT&T have been shared with you.

4. At this time, you are not required to take any action. You will be notified of any meetings in which your grievance is presented..

5. The "stop the clock" phrase refers to the need to meet the timelines set by Article IV of the arbitration procedures. For clarification, your termination is a separate grievance that AT&T has not yet considered. The DML is the subject of this grievance.

I hope this information was helpful. Please let me know if you have any additional questions.

Sincerely,

Jose Lozano
CWA Staff Representative

**Subject:** Request for Information and Clarification Regarding Arbitration Recommendation

**Josue Zavala**

1113 Churchill Rd.,

River Oaks, TX, 76114

Jzavala.cwa@gmail.com

619-917-7416

7-6-25

**Jose Lozano**

CWA Representative

**Re:** Request for Information on Arbitration Recommendation – CWA 6-25-035 (Josue Zavala – DML)

Dear Brother Lozano,

I hope this letter finds you well. I am writing to formally request all pertinent information regarding the recommendation for arbitration in my case (CWA 6-25-035 – Josue Zavala – DML).

To my understanding, my grievance was recommended for arbitration, but I was not informed of this decision or the subsequent steps in the process. I only became aware of this development after the NLRB contacted the union on my behalf. While I appreciate receiving a copy of the letter sent to the company (dated April 11, 2025), I was never notified of this document or its contents beforehand.

1. **Detailed Explanation**: A clear explanation of why my grievance was recommended for arbitration, including the union's assessment of the case and the expected timeline for the arbitration process.
2. **Process Overview**: A step-by-step outline of what I can expect during arbitration, including any preparation required on my part, potential outcomes, and my role in the proceedings.
3. **Documentation**: Copies of all correspondence, reports, or other documents related to the arbitration recommendation and the case file, including any communications with the company.
4. **Communication**: A commitment to timely updates and responses to my inquiries, as well as advance notice of any meetings, deadlines, or actions required of me.
5. **Next Steps**: Clarification on whether the company has agreed to "stop the clock" on this case, as requested in the April 11 letter, and what this means for my employment status.

I take this matter very seriously, and it is crucial that I am fully informed and involved in the process. Please provide the requested information as soon as possible, and let me know a convenient time to discuss this further, either by phone or in person.

Thank you for your attention to this matter. I look forward to your prompt response.

Sincerely,
**Josue Zavala**

cc: Loren Williams, President, Local 6201
Derrick Osobase Sr., Vice President, CWA District 6

[Quoted text hidden]

**Notice to Josue Zavala - DML - Local 6201.pdf**
153K

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 1**

**J l 6, 2025 E ail fro Jos e Zavala to Jose Lo ano re est for rocess doc entation**

Gmail

Josue Zavala <jzavala.cwa@gmail.com>

## Fwd: 6-25-035 Josue Zavala - Letter of intent/stop the clock

**Josue Zavala** <jzavala.cwa@gmail.com> Sun, Jul 6, 2025 at 3:00 PM
To: Jose Lozano <jlozano@cwa-union.org>
Cc: cwa6201pres@gmail.com, Derrick Osobase <dosobase@cwa-union.org>
Bcc: Vicente Barron <vbarron.cwa@gmail.com>, Hookem0388@gmail.com, Josh Black <Joshblack07@att.net>, Josue Zavala <jzavala.cwa@gmail.com>

**Subject:** Request for Information and Clarification Regarding Arbitration Recommendation

**Josue Zavala**

1113 Churchill Rd.,

River Oaks, TX, 76114

Jzavala.cwa@gmail.com

619-917-7416

7-6-25

**Jose Lozano**

CWA Representative

**Re:** Request for Information on Arbitration Recommendation – CWA 6-25-035 (Josue Zavala – DML)

Dear Brother Lozano,

I hope this letter finds you well. I am writing to formally request all pertinent information regarding the recommendation for arbitration in my case (CWA 6-25-035 – Josue Zavala – DML).

To my understanding, my grievance was recommended for arbitration, but I was not informed of this decision or the subsequent steps in the process. I only became aware of this development after the NLRB contacted the union on my behalf. While I appreciate receiving a copy of the letter sent to the company (dated April 11, 2025), I was never notified of this document or its contents beforehand.

1. **Detailed Explanation**: A clear explanation of why my grievance was recommended for arbitration, including the union's assessment of the case and the expected timeline for the arbitration process.
2. **Process Overview**: A step-by-step outline of what I can expect during arbitration, including any preparation required on my part, potential outcomes, and my role in the proceedings.

3. **Documentation**: Copies of all correspondence, reports, or other documents related to the arbitration recommendation and the case file, including any communications with the company.
4. **Communication**: A commitment to timely updates and responses to my inquiries, as well as advance notice of any meetings, deadlines, or actions required of me.
5. **Next Steps**: Clarification on whether the company has agreed to "stop the clock" on this case, as requested in the April 11 letter, and what this means for my employment status.

I take this matter very seriously, and it is crucial that I am fully informed and involved in the process. Please provide the requested information as soon as possible, and let me know a convenient time to discuss this further, either by phone or in person.

Thank you for your attention to this matter. I look forward to your prompt response.

Sincerely,
**Josue Zavala**

cc: Loren Williams, President, Local 6201
Derrick Osobase Sr., Vice President, CWA District 6

[Quoted text hidden]

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 1**

**T e "FX West Re ion Pilot" Doc ents**

# TX West Region Pilot – Neighbor CBR Look Up

DOC
connecting to the future

## Opportunity / Analysis

**Opportunity/Issue**

- The TX West Region has some of the highest rates of JEP for no access. Can Be Reached (CBR) phone numbers for neighboring properties will help Field Technicians reduce the number of no access JEPs.

## Timeline

- May 27, 2022 – FLA access to AT&T licensed white pages look up service.
- May 31, 2021 – allow field teams to SmartChat requests for neighbor CBR phone number(s).
- Weekly – Review of pilot initiative results.

## Field Technician Preliminary Steps

**Before SmartChat for CBR Look Up, the Field Technician will:**

1. Ask their customer if they can arrange access, or if they have CBR phone number(s) for the neighbor, and
2. Knock on the entrance of the neighboring property.

- NOTE: If there is no access the Field Technician will:
  - ➢ Leave a door hanger on the neighboring property,
  - ➢ Note the ticket with CBR phone number(s), and
  - ➢ JEP the ticket for no access.

## FLA Steps

**SmartChat for Neighbor CBR Number(s) Look Up:**

1. Ask the Field Technician to confirm the address of the neighboring property.
2. Enter the address of the neighboring property into the licensed white pages look up service.
3. Select a resident.
4. Provide the Field Technician the resulting CBR phone number(s) or inform the Technician that a door hanger must be left, and the job must be JEPd for no access.
5. Note the ticket that neighbor CBR phone number(s) were provided to the dispatched technician.

**AT&T Security Policy and Requirements (ASPR)**

- FLAs will be given access to an AT&T licensed white pages reverse phone number look up service.
- Public record information is to be retrieved only for legitimate business purposes.
- It must be treated as Restricted Personal Information (RPI), managed under the AT&T Security Policy and Requirements (ASPR), and used only by authorized individuals within the AT&T companies.










AT&T Proprietary (Internal Use Only)
Not for use or disclosure outside the AT&T companies except under written agreement

# Smart Chat

Below the Purpose of Request, select the option for No Access Neighbor



**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 1**

**M&P AT&T No Access Polic**

Field Ops - PremWire/Core/CO M&P Updated on: July 5, 2022

# M&P: AT&T No Access Policy

(https://att-no-access-policy/#at038t-no-access-policy)

AT&T

**ATT-TELCO-002-203-917**

**Prem/Wire/Core, BSIM (), NDC: AT&T No Access Policy**

**General**

All Methods and Procedures in this document adhere to AT&T's competition policy which includes compliance with the section 272 (e)(1) parity service requirements with respect to exchange and exchange access services, and employees are reminded to consult with Legal regarding any section 272(e)(1) issues or questions. Section 272(e)(1): A Telco shall fulfill any requests from an unaffiliated entity for telephone exchange service and exchange access within a period no longer than the period in which it provides such telephone exchange service and exchange access to itself or to its affiliates.

**Introduction**

**1. Prem/Wire/Core Technician Responsibilities**

The following information defines the procedures a Prem/Wire/Core technician must follow before a no access status of a work request can be performed:

- Pre-call the can be reached number (CBR) or Local Contact (LCON ()) contact number(s) listed on the work request before arriving at the premises.
- If there are multiple contact numbers, the technician must call all numbers listed on the work request to avoid a no access situation. Every effort must be made to gain access and make customer contact.

**NOTE:**

Additional contact information can be found on the Line Records for repair or on the (View Service Order Image) for installation. In additional, contact information may be found in the OSSLOG (for WFA sourced jobs). An additional option is to review the history related to a previously closed trouble report.

- Always verify work request for any special access arrangements.
- As a rule, the technician will wait *15* minutes on the premises for access arrangements for POTs / Resale and DSL.
- If the CBR or LCON () customer representative is not available, or doesn't answer the pre-call, the Prem/Wire/Core technician must make a visit to the premises.
- If a technician arrives prior to the access time requested by the customer / end-user and there is no access, the technician must revisit the job during the access time specified by the customer / end-user.

Once on premises, the technician should attempt to perform as much preliminary work as possible to allow work request to be closed on due date.

- Testing cable pairs to identify faults.
- Troubleshoot metallic faults.
- Isolating trouble to the customer side on the Network Interface.

include detailed information such as the phrase *UNABLE TO ADVISE CLEC OF NO ACCESS DUE TO TIME ON HOLD OVER 15 MINUTES*.

**1.5.2. Return Narrative**

The technician's return narrative on a no accessed repair ticket shall read: *NAS TO (NID, DEMARC, TERM, ETC.) TROUBLE IN-GOOD TO (B-BOX, TERM, ETC.) CALLED (CLEC NAME AND CLEC TESTER NAME) @ (TIME) TO ADVISE*. While this narrative example is not meant to be used verbatim, it contains all information necessary for the closeout. It is imperative that the CLEC called name and number be documented for future reference. For CLEC orders and repair that are not completed for any reason, the technician will call the LOC at 800-842-5259.

**2. No Access to AT&T Network Facilities**

If there is no access to AT&T facilities, the technician will attempt to get other access numbers from the customer for access to the AT&T facilities. If access can not be arranged, the technician should instruct the customer to make arrangements for access to AT&T facilities. The technician should leave a customer status door hanger, instructing the customer to contact the appropriate department listed to make new access arrangements. The technician will notify their manager and return the work request. The appropriate return codes for this scenario would be:

Maintenance –

NAO (9 States);

M60 NAO (12 States):

Installation –

SO1 (9 States);

I22 (12 States) Subscriber Other.

These codes also apply when a technician cannot access AT&T's demarcation point where the customer is not in control of demarcation point (i.e. equipment room not accessible). There are multiple instances of subscriber no access reasons:

(1) Technician tests at the demarcation point, determines the trouble condition to be on the customer's side of the demarcation point, and cannot gain access to the customer's premises, and the customer has an inside wire plan.

(2) Technician cannot get access to the demarcation point due to customer reasons (i.e. locked gate, dog, etc.)

(3) Reports of known inside troubles such as jack broken, wires off wall, etc. also apply for NAS status, if the customer has an inside wire plan.

(4) Reports of noise on line with MLT VER code 0 (zero), and the noise cannot be isolated may qualify for no access status (Retail/Resale). The appropriate return codes for these scenario would be:

Maintenance –

NAS (9 States);

M05 (12 States):

Installation –

SA1 (9 States);

I01 (12 States).

**NOTE:**

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 20**

**AT&T eneral Level Denial Letter DML rievance, Fe r ar 25, 2025 Ste art to Jose Lo ano**

AT&T

Guy Stewart
AT&T SW Labor Relations
5501 Alliance Gtwy. Frwy
Ft. Worth Texas 76177
Fax: 214-486-8169
Office: 817-682-3136

February 25, 2025

Mr. Jose Lozano
CWA Staff Representative
2300 Valley View Lane, Suite 700
Irving, Texas 75062

Re: Appeal to Genral Level – Josue Zavala - DML
Ft. Worth Tx. – Local 6201 – Grievance #D-124-23-ATTSW

Dear Mr. Lozano:

This will confirm that a meeting was held for the purpose of hearing an appeal to the general level of a formal grievance described in the Union's letter dated February 21, 2024 as follows:

"Action of the Company in Mr. Josus Zavala being placed on a DML on or about September 27, 2023.

The Union contends this action to be without just cause."

The meeting was recessed to consider the Union's request to resolve the grievance. The Company has found no contractual violation. Mr. Zavala was on a job and needed access to adjacent customer to continue with his order. Mr. Zavala was advised by the AT&T manager to smart chat in and advise of the situation. Rather than Mr. Zavala looking for solutions, he continued to argue with the manger on scope of work. The manager asked him to call, but Mr. Zavala continued to argue and ultimately left the job without completing his order. The Company is denying the grievance, and this letter is intended to confirm that decision.

Sincerely,

Guy Stewart
Lead Labor Relations Manager

**IN THE UNITED STATES DISTRICT**
**COURT FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and** | § | |
| **COMMUNICATIONS WORKERS** | § | |
| **OF AMERICA, LOCAL 6201** | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 21**

**J l 20, 2026 E ec tive Board Decision DML**

**Communications**
**Workers of America**
AFL-CIO, CLC

501 Third Street, N.W.
Washington, D.C. 20001-2797
202/434-1321 Fax: 202/434-1481

**Ameenah Salaam**
Secretary-Treasurer

***Sent via E-mail:***

July 21, 2026

Josue Zavala
Jzavala.cwa@gmail.com
1113 Churchill Road
River Oaks, TX 76114

Re: Grievance No. 6-25-035 – DML – Local 6201

Dear Member Zavala:

This letter will advise you that on July 15, 2026, the CWA Executive Board has considered your appeal after which they adopted the following motion:

**MOTION:** Move that Josue Zavala's appeal be denied and uphold President Cummings and District 6 Arbitration Review Panel's decision.

You have now exhausted your Internal Appeals Procedures, and there is no further action to be taken.

Sincerely,

Ameenah Salaam

Ameenah Salaam
Secretary-Treasurer

cc: Derrick Osobase
Billy Moffett
Michael Cowles
Jose Lozano
Loren Williams, Local 6201, President

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 22**

**Te t Messa e E c an e Bet een Plaintiff, Witness Mic ael Stinson and Mana er Kain Tro ell Se te er 1 , 2023**


17
2 People
iMessage
Yesterday 12:20 PM
+1 (214) 668-7089
These are the 4 numbers to call for access. Per our conversation before I am directing you to call for access 972-890-6152, 972-224-8714, 972-805-7521, 972-289-0882
I have concerns that this is an unethical directive as I believe this work belongs to another work group. I am not refusing your derivative. I would first like to see some clarification and information that reads that premises technicians are required to investigate other property owners personal information to acquire access. I would like to see this information to alleviate my concerns
+1 (214) 668-7089
Ok not a problem. I will schedule a meeting with you next week. I however tried did try to call with no answer. Go ahead and return to reschedule unknown and let the customer know we need access to the neighbors back yard.

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOSUE ZAVALA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-cv-01213-O-BP** |
| | § | |
| **AT&T SERVICES, INC., and COMMUNICATIONS WORKERS OF AMERICA, LOCAL 6201** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

**E i it 23**

**Te t Messa e E c an e Bet een Plaintiff and Mana er B ron Ma ors Dece er 15, 2023**


9:46
5G+
22
Byron
Are you able to help me with this
I was driving from McKinney. I just got back the office. Checking
2 occurrences from what it looks like
Fri, Dec 15 at 2:33 PM
Ok thanks
Today 9:44 AM
Hey byron I have no access to a yard where the pole is and I can't test the pole
Delivered
Ok, return to cx request later due date have the customer contact neighbor.
iMessage
Cash
Q W E R T Y U I O P
A S D F G H J K L
Z X C V B N